St. Paul & Chicago Railway Company *vs.* F. S. McDonald and another.

October 15, 1885.

**Exemption from Taxation—Swamp Land granted to Railroad—Contract to Sell.**—By Sp. Laws 1865, *c.* 9, the swamp lands granted by the state to the St. Paul & Chicago Railway Company, to aid in the construction of its road, are subject to taxation whenever contracted to be sold, conveyed, or leased by the company.

**Same—Intention of Contract.**—In determining whether a transaction constitutes a conveyance of these lands, equity will not permit its external form to control, but will look beyond the mere form or words of the contract on its face, and inquire into its real character.

**Same—Contract Construed.**—Upon the evidence in this case, *held,* that the transaction between the railway company and the Minnesota Railway Construction Company, although in *form* a mortgage, amounts in *effect* and *substance* to a conveyance of the lands in controversy, and hence that the same are subject to taxation within the meaning and spirit of the statute.

Plaintiff brought this action in the district court for Hennepin county, to restrain the defendants, the auditor and the treasurer of Hennepin county, from proceeding in the levy and collection or enforcement of taxes upon certain lands situated in Hennepin county, claimed by the plaintiff to be owned by it and to be exempt from taxation. The action was tried by *Young*, J., without a jury, and judgment was ordered for the plaintiff. Defendants appeal from an order refusing a new trial.

The complaint, after alleging the creation and existence of the plaintiff corporation, under the laws referred to in the opinion, the

exemption from taxation, the granting of swamp lands to aid in the construction of plaintiff's railroad, and the statute authorizing the issue and sale of preferred stock, sets out that, on August 6, 1868, for the sole purpose of providing requisite means for the construction and equipment of its railway from St. Paul to Winona, no part of which had then been constructed except a portion of the grading between St. Paul and Hastings, the board of directors of plaintiff adopted the following resolution, viz. :

"Whereas it is necessary that the St. Paul & Chicago Railway Company, in order to provide the requisite means for the construction of the railway to connect the cities of St. Paul and Winona, should create a special preferred stock;   *   *   *   Now therefore, to this end, resolved that the St. Paul & Chicago Railway Company will create and issue, and does hereby authorize the creation and issue of, $3,000,000 of special preferred capital stock, divided into 30,000 shares of $100 each, which is hereby made, constituted and declared to be a special preferred railway and land stock, and shall represent and control and have the entire property of said railway company in and to all lands which have been or which shall hereafter be granted or donated to said company by the state or United States, or by any municipality, corporation or individual, not actually used and occupied or required for use and occupation by the railway track, or for right of way, gravel pits, or for station or depot grounds; and in addition to said special ownership of lands, the said special preferred stock and land stock shall be entitled to a dividend of ten per cent. per annum from the net earnings of the railway of each current year after payment of interest on all mortgage bonds, if the railway earn so much during the current year, and before the payment of any dividends to other class of stockholders." (Then follow certain provisions as to the method and manner of paying this ten per cent dividend.)

The complaint then alleges that under this resolution the plaintiff entered into the following agreement with the Minnesota Railway Construction Company for the building of said railroad, viz.:

"This agreement, made and entered into this 6th day of August, 1868," (the contract introduced in evidence bears date in June, 1869,

—the date stated in the opinion,) "by and between the St. Paul & Chicago Railway Company, party of the first part, and the Minnesota Railway Construction Company, party of the second part, both of said corporations being duly and legally incorporated under the laws of the state of Minnesota—

"Witnesseth, that whereas the said St. Paul & Chicago Railway Company is desirous of securing the construction and equipment of its line of railway to connect the cities of St. Paul and Winona.

"Now, therefore, in consideration of the premises and of the undertakings and promises of the said St. Paul & Chicago Railway Company herein set forth, the Minnesota Construction Company hereby agrees to obtain the necessary right of way and to build and equip said railway according to the directions, and in the manner and time which shall be prescribed by said railway company, so that the same, when completed, shall, upon the average, in every way equal in its construction and equipment the First Division of the St. Paul & Pacific Railroad, extending from St. Paul to Sauk Rapids.

"The said St. Paul & Chicago Railway Company, in consideration of the premises and of the undertakings of the said Minnesota Railway Construction Company, hereby agrees to sell, transfer and assign, and by these presents does sell, transfer and assign, to said Minnesota Railway Construction Company, for building and equipping said railway as aforesaid, as follows, viz.:

"*First*, $3,000,000 of the first mortgage land-grant bonds of the St. Paul & Chicago Railway Company, secured by mortgage or deed of trust to the Farmers' Loan and Trust Company of the city of New York, dated February 1st, 1868, or an equivalent amount of similar first mortgage bonds, to be secured either by a new first mortgage on the same premises, or by a supplement or amendment of the present mortgage to said Trust Company.

"*Second*, $3,000,000 of special preferred capital stock, which special preferred capital stock is to be limited to $3,000,000 in amount, and is to be created and issued under and in pursuance of an act of the State of Minnesota, entitled 'An act to amend the charter of the St. Paul & Pacific Railroad Company,' approved February 6, 1864; also 'An act to amend certain laws relating to the St. Paul and Chi-

cago Railway Company,' approved March 8, 1868, both of which laws are hereinbefore set out so far as they relate to said special stock, and also any other laws of the state relating to this subject, and shall give the holders thereof a preference from said railway company of ten per cent. per annum from the net earnings of said railway, and absolute separate ownership of all the lands which have been or which shall be hereafter granted to or acquired by said railway company, in aid of the construction of said railway, either by or from the United States, or by or from the State of Minnesota, or by or from any municipality or corporation or individual whatsoever, excepting lands used or necessary for right of way, gravel pits and depot purposes.

"*Third.* All their right, title, and interest in and to any and all of the present capital stock of six millions ($6,000,000) of dollars of said St. Paul & Chicago Railway Company now outstanding, however the same may have been issued, whether hypothecated or held in trust or for any other purpose whatever.

"*Fourth.* All gifts, donations, bounties or aids in any form or shape which have been or may hereafter be made or given by any person, corporation, municipality or state to aid in the construction of said railway.

"It is mutually agreed that the road shall be built according to the directions and in the manner which shall be prescribed by the railway company, and that the construction company are to be paid and are to receive all their payments for the construction in advance, and that they are to assume the contracts heretofore made with Reynolds, Saulspaugh & Co., and Charles A. F. Morris, under which the road has been partly graded, and is to be completed ready for superstructure from St. Paul to a point near Hastings, a distance of about twenty miles."

The complaint further alleges that no use was ever made of said preferred special land and railway stock; that the construction company found it impossible to negotiate the same to raise funds to build the road, and on Feb. 3, 1871, while the road was unfinished and the contract unperformed, and the construction company was unable to perform this contract for want of funds and inability to raise funds, it submitted a proposition to the plaintiff to modify this contract so

far as the preferred stock was concerned, and to relinquish all claims thereto, and receive in place thereof land grant and mortgage bonds for the same amount, secured by a mortgage from the plaintiff on the same lands, which proposition was contained in the following letter:

"MINNESOTA RAILWAY CONSTRUCTION COMPANY,
NEW YORK, Feb. 3rd, 1871.

"*Hon. E. Rice, Pres't, St. Paul & Chicago Ry. Co.*

"DEAR SIR: By the terms of our contract with your company for the construction and equipment of the railway from St. Paul to Winona, we are to receive in part-payment $3,000,000 of special preferred stock, bearing ten per cent. interest per annum payable from the earnings of your company, and representing the exclusive and absolute ownership of all lands donated to aid in building the railway, excepting the land used or necessary for right of way, gravel pits and depot purposes.

"At the time of making the contract, June 29th, 1869, the capital stock of railway companies was, as compared with their mortgage bonds, a popular investment, and much sought after by persons investing in railway securities. This feeling has now entirely changed, very little capital is now seeking investment in railway securities of any kind, and we find the special preferred stock which you have heretofore issued to us almost useless in our hands. We cannot sell it at any price commensurate with its cost to us, nor can we borrow money by hypothecating it. Our capital, as you are aware, is $2,000,000. This is now substantially exhausted by the cost of the work done and in progress to this time, and the road is not finished, nor can its construction and equipment be completed or anywhere nearly completed on our present capital. The bonds received by us have been used to secure this $2,000,000 of capital.

"We regret to say that if payment is to be made under our contract in the special preferred stock, we cannot build and equip the road as agreed; we cannot raise the necessary additional capital required. We do not propose to repudiate our contract, but we do propose to you to so modify and change it that instead of giving us the $3,000,000 of special preferred stock, you will allow us to return the

same to you to be cancelled, and that you will give us in lieu thereof a land-grant mortgage bond of the same amount as the stock, and at the same rate of interest, and secured by a mortgage on all the lands the ownership of which is now represented by the special preferred stock.

"This change will release your road from the ten per cent. interest on the special preferred stock, and will restore the ownership of the fee-simple title of the lands to the common stockholders of your company, who will then own the lands subject to the mortgage; it will enable us, as we hope and believe, to build and equip the road as per contract.

"MINNESOTA RAILWAY CONSTRUCTION Co.

"By RUSSELL SAGE,

"President."

That such proposition was accepted, and the original contract modified and changed by the following contract, viz.:

"*Whereas*, The St. Paul and Chicago Railway Company has paid to the Minnesota Railway Construction Company, in part-payment of their contract made June 29, 1869, three million dollars of special preferred stock, having a preference of ten per cent. per annum upon the net earnings of the railroad, and an absolute ownership of the lands donated to aid in building said road, with exceptions as set forth in the original contract, and

"*Whereas*, The said Railway Construction Company, for reasons given in a letter to the directors of the St. Paul and Chicago Railway Company, dated February 3, 1871, are willing to and desirous of surrendering said special preferred stock to the St. Paul and Chicago Company, to be cancelled, and to receive in lieu thereof a mortgage upon all the lands donated to aid in building said line of railroad, to secure the payment of an indebtedness of three million dollars, bearing interest at the rate of ten per centum per annum, thus releasing the net earnings of the railroad from a liability of ten per cent. per annum.

"*Now, therefore*, in consideration of the premises, it is agreed by and between the parties to said contract,

"*First*, That said contract be so changed as that the said Minnesota Railway Construction Company shall surrender to the St. Paul and Chicago Railway Company the said $3,000,000 of special preferred stock, and that the same shall be cancelled; that the St. Paul and Chicago Railway Company acknowledge themselves to be indebted under said contract to the Minnesota Railway Construction Company in the sum of three million dollars, with interest thereon at the rate of ten per cent. per annum from July 1, 1871, until paid, which indebtedness they agree to secure by a mortgage or trust deed, with all the usual covenants and guarantees, conveying and embracing all of their lands now had or hereafter to be acquired, donated to aid in building their railroad either by the United States or the state of Minnesota, or both, or from any other source, except land used or necessary for right of way, gravel pits or depot grounds.

"*Second*, That the Minnesota Railway Construction Company hereby renew their obligation to build and equip said railroad as set forth in the original agreement, made June 29, 1869.     In witness whereof," etc.

The complaint further alleges that the defendants pretend that the acts and proceedings hereinbefore set forth have rendered the lands of plaintiff subject to taxation, and are proceeding to assess, levy and enforce taxes thereon.     That such threatened proceedings are in direct disregard of the contracts between the state and the plaintiff company and its predecessors the St. Paul & Pacific Railroad Company and the Minnesota & Pacific Railroad Company.     That plaintiff and its predecessors have complied with all the provisions of the laws relating to the payment of taxes on gross earnings in lieu of taxes on its railway or land grant, and have regularly and in strict compliance therewith paid the per centum of their gross earnings into the treasury of the state of Minnesota as required by law, and that the plaintiff has no adequate remedy at law.

The answer denies that the land mentioned in the complaint has not been sold and conveyed or contracted to be sold, conveyed or leased by the plaintiff, and alleges that the same was sold and conveyed by the plaintiff long prior to the commencement of this action, and that in and by the agreement set forth in the complaint the land

described, and all the other lands of the plaintiff, were sold and conveyed, and contracted to be sold and conveyed, to the said construction company.

The answer further denies that said construction company found it impossible to negotiate the said special land and railroad stock, or that said road was unfinished or said contract unperformed, or that said construction company were unable to perform their contract for want of funds or inability to raise funds as alleged in the complaint or otherwise; and alleges that the sole object, intent and purpose of the parties in making such modified agreement was to retain or replace the normal title of said land in said plaintiff in trust for the sole use and benefit of said construction company, so that the same should escape taxation, and that it was never intended thereby to vest or reconvey to said plaintiff any beneficial or equitable interest or title therein or thereto.   The answer admits all other allegations of fact contained in the complaint.

The court found the following facts, viz.:   That, at the time of the creation of said special preferred stock, the railroad had not been constructed and it did not appear that the lands had been selected by, and been conveyed to, the railroad corporation, as provided in all the granting acts; that after the execution of the contract of August 6, 1868, the construction company made no use whatever of the stock, nor did it appear that the certificates of stock were ever in fact issued and delivered to the construction company; that on or about February 3, 1871, the construction company, by agreement with the plaintiff, surrendered said special preferred stock, which was cancelled, and a mortgage on the lands named in the stock was executed and delivered to the construction company, as security for the building and equipping of the railroad; that the reason for such surrender of stock and the modification of the contract was because the mortgage was more available than the stock as security for the rest of the money with which to build the road.   From such findings and the admissions of the pleadings the court found, as conclusions of law, that the creation and issue of the special preferred stock did not operate as a sale and conveyance of the land described in the stock, within the meaning of the act of the legislature by which the

lands were granted to the plaintiff, and which provided upon what conditions said lands should become subject to taxation; that plaintiff never has, so far as appears, sold and conveyed the land in question since it became possessed of the title thereto, and hence the land has never become subject to taxation, and is still exempt; that plaintiff is entitled to the relief demanded, and that the injunction prayed for be made perpetual.

*Wm. J. Hahn,* Attorney General, and *J. M. Martin,* for appellants, cited *State* v. *Winona & St. Peter R. Co.,* 21 Minn. 472, and *State* v. *Trustees,* 21 Minn. 344.

*Gordon E. Cole,* for respondents.

An absolute deed to the company which built the road, for the sole purpose of transferring the land grant to it, to enable it to stand in the place of the original company, and obtain from their sale and disposition reimbursement for the funds employed in constructing it, would not render the lands taxable. The compact of 1857, as modified by that of 1865, is not an exemption nor a gratuity. It is a compact or contract upon abundant consideration, viz.: a payment throughout all time by the railroad company and its successors of a percentage of its gross earnings. "The rule that statutes creating exemptions are to be strictly construed does not apply where the legislature commutes the amount of tax imposed in the usual manner upon railroads, for a certain percentage upon their annual income. The percentage is regarded as a fair equivalent for the taxes released. The construction in such a case should not be strict against the company, nor liberal to the public, but a fair and liberal construction for the company." Burroughs on Taxation, 133; *City of St. Paul* v. *St. Paul & Sioux City R. Co.,* 23 Minn. 469.

The gist of this compact is to protect the lands, no matter what successor to the original corporation holds them, until they have been actually disposed of and their proceeds applied in reimbursement of persons who have put their money into the construction of the roads. *First Div., etc., R. Co.* v. *Parcher,* 14 Minn. 224, (297,) 254, (331;) *County of Nobles* v. *Sioux City & St. Paul R. Co.,* 26 Minn. 294; *State* v. *Winona & St. Peter R. Co.,* 21 Minn. 315; *Minnesota Cent. Ry. Co.* v. *Melvin,* 21 Minn. 339.

The issue of special preferred land stock was not a conveyance or an agreement to convey or a lease of the lands so as to render them taxable. Holders of preferred stock are entitled to the same general rights and privileges, and are subject to the same liabilities, as holders of the original or common stock. Field on Corporations, § 120; Boone on Corporations, § 115; *In re Bangor Slate & Slab Co.*, L. R. 20 Eq. 59; *Kent* v. *Quicksilver Mining Co.*, 78 N. Y. 159–179; *St. John* v. *Erie Ry. Co.*, 22 Wall. 136; *Branch* v. *Jesup*, 106 U. S. 468; Pierce on Railroads, 125; *Burt* v. *Rattle*, 31 Ohio St. 116; *Warren* v. *King*, 108 U. S. 389.

The special stock never had aught but a potential existence. A mortgage was substituted for it, and the law expressly declares that a mortgage interest is not taxable.

MITCHELL, J. Incorporated by Laws Ex. Sess. 1857, *c.* 1, under the name of "The Minnesota & Pacific Railroad Company," revived by Sp. Laws 1862, *c.* 20, under the name of "The St. Paul & Pacific Railroad Company," which was changed to the present name pursuant to Sp. Laws 1867, *c.* 1, the plaintiff was organized to build a railroad from St. Paul to Winona. The lands, the taxability of which is the issue in the present case, are a part of a grant of swamp land made to this company by the state by Sp. Laws 1863, *c.* 4, to aid in the construction of this road. This grant amounted to 462,000 acres, being seven sections to the mile, although it appears that the railway company claimed it to be double that amount, or fourteen sections to the mile. According to plaintiff's own testimony, it is not worth to exceed $1.25 per acre, or $577,500.

By the charter of this company a commuted system of taxation was stipulated for, by which, in consideration of the payment of a percentage of the gross earnings of the road to the state, the lands and other property of the company were to be forever exempt from taxation. Laws 1857, Ex. Sess. *c.* 1, § 18; Sp. Laws 1865, *c.* 6. By the original grant the lands in question were not to be subject to taxation until sold and *conveyed* by the company. Sp. Laws 1863, *c.* 4. This was subsequently modified so that whenever any of these lands should be *contracted to be sold, conveyed, or leased* by the company, the same should be placed upon the tax-list for taxation as

other real estate, for the year succeeding that in which such contract for a sale, conveyance, or lease thereof should have been made; but in enforcing the collection of the taxes the title or interest of the company, or any trustee or mortgagee thereof, should in nowise be impaired or affected thereby.     Sp. Laws 1865, *c.* 9.

In June, 1869, the railroad company entered into a contract (which is fully set forth in the record) with "The Minnesota Railway Construction Company" for the construction and equipment of its line of road from St. Paul to Winona, by the terms of which the latter agreed to obtain the necessary right of way, and build and equip the line complete, and, in consideration of such agreement, the railway company sold, transferred, and assigned to the construction company —*First*, $3,000,000 first mortgage land-grant bonds of the railroad company; *second*, $3,000,000 (the whole issue to be limited to that amount) of special preferred capital stock of the railway company, issued pursuant to Sp. Laws 1864, *c.* 3, which should give the holders a preference from said railway company of 10 per cent. per annum from the net earnings of the road, and *absolute separate ownership of all the lands* which had been or which should be thereafter granted to or acquired by the railway company in aid of the construction of the road; *third*, all their right, title, and interest in and to all of the $6,000,000 capital stock of the railway company; *fourth*, all gifts, donations, bounties, or aids in any form or shape which had been or might thereafter be made or given by any person, corporation, municipality, or state, to aid in the construction of such railway; *fifth*, the railway company also agreed to make and deliver to the construction company any and all other documents and instruments in writing which the construction company should require or be advised by counsel as necessary or important to them to more effectually carry out the true intent and meaning of the agreement.

This rather remarkable contract, by which the railroad company completely sold itself out to pay for the construction of its road, was fully executed on its part.   Although, perhaps, not very important, it is claimed that the $3,000,000 special preferred capital stock, which was to give its holders absolute separate ownership of the lands, was never issued.   But the fact that it was actually issued is virtu-

ally admitted in the complaint, and conclusively proved by the evidence.

Under this contract the construction company proceeded to build the road. In February, 1871, after the greater part of the road was constructed, but before it was completed, the construction company applied to the railway company, asking for a modification of the contract so as to allow it to return the $3,000,000 special preferred stock to be cancelled, and that in lieu thereof the railway company execute to it a mortgage upon all the lands (the 462,000 acres) donated to aid in the construction of the road, for $3,000,000, with interest at 10 per cent. This modification was assented to and executed by the return and cancellation of the special preferred stock, and the execution of a mortgage on the lands for $3,000,000, presently due. Only one bond or certificate of indebtedness was issued to represent the entire amount.

As this modification was made before the railway company had acquired title to or fully earned these lands, we shall not consider the effect of the issue of this special preferred stock further than as it may serve to characterize what followed. In the communication to the railway company the reason assigned by the construction company for requesting this change of the contract was inability to raise money on the special stock with which to complete the road. But there is very little in the surrounding circumstances to indicate that this was the real, or at least the important and controlling, reason for requesting the change; for it nowhere appears that the construction company ever attempted to raise money on the stock, or ever raised, or attempted to raise, money on the mortgage after the change was effected. The mortgage was certainly not put in the usual form of railway mortgages or trust deeds, when the bonds are intended to be placed on the market. But however that may be, it pretty conclusively appears that the important consideration for making the change was the fact that while the lands were represented by this stock, they might be liable for the debts of the railway company. Two facts are, in our opinion, very evident: *First,* that by the original contract, whatever misapprehension might have existed as to its legal effect, the intention was that the issue of the special preferred

stock should give the construction company the *absolute and separate ownership* of the lands; and, *second*, that the object of the modification of the contract was, not that the construction company should take a less interest in the lands, but that it might hold more securely the beneficial interest in them which it was intended by the original contract that it should have. The mortgage was not an ordinary railway mortgage, and could never, under the circumstances, have been intended or expected to perform the ordinary offices of a mortgage. In view of facts hereafter referred to, it could never have been intended or expected that the railway company would ever pay the mortgage or redeem the lands. The necessary effect and manifest purpose of it was to accomplish, in another form, what was designed to be done by the original contract, viz., to turn over to the construction company the entire beneficial interest in the lands, but in a way that would secure them against possible claims of creditors of the railway company. Another result of this change was, in effect, to separate the land grant from the other property of the railway company. Whether this was desired in anticipation of a sale of the road, which was actually made in the following January, it would perhaps be improper here to speculate.

After this modification the construction company proceeded and completed the building of the road. In January, 1872, the entire road was sold and transferred to the Milwaukee & St. Paul Railway Company, leaving the St. Paul & Chicago Railway Company "a mere legal shadow," which neither owned nor operated a mile of road, and possessed no property, present nor prospective, unless it was the right of redemption in these lands, already incumbered for several times their value. The stock of the company represented nothing of any intrinsic value. It is as Mr. Chamberlain himself expresses it, "a mere myth," of no value, and held "merely to keep up the organization." The construction company, which owns it, (they have undisputed title to $4,000,000 of it, and claim to own the other $2,000,-000,) use it solely for the purpose of keeping in name and form the organization of the St. Paul & Chicago Railway Company,—and this is confessedly kept up for the sole purpose of holding the nominal legal title of these lands. When asked the question, Mr. Chamber-

lain admits that he knows of no other purpose, and that if there was one he thinks he would know it.

Under the form and name of this "legal shadow," the construction company control the lands. Although the mortgage has been overdue for over 15 years, and nothing paid on it except the proceeds of some 30,000 or 35,000 acres of the land sold to third parties, and the security confessedly not worth a fifth of the debt, and the railway company possessed of nothing out of which the deficiency can be made, yet the construction company has taken no steps to foreclose or perfect title. The lands are managed by an agent, nominally of the railway company, but really of the construction company, who remits the proceeds of sales to the trustee named in the mortgage for the benefit of the construction company. The ownership of the lands is entirely divorced from that of the road. The St. Paul & Chicago Railway Company, existing only in name, has no valuable or beneficial interest in either. The entire beneficial interest in the lands is, to all intents and purposes, in the construction company.

After thus stating the facts as we understand them, very little remains by way of argument. The legal principles involved are few and simple. The exemption from taxation stipulated for in this charter is a privilege or immunity for the benefit of the railway company, and not inhering in the property, or passing to an assignee or grantee of the lands, severed from the enterprise in aid of which the grant was made. Equity will never suffer the mere appearance or external form to conceal the real nature and purpose of a transaction. The question is not what are the words or terms of a contract on its face, but what is its real character? It would be useless as well as disingenuous for a court to profess to be so blinded by the mere external form as to be unable to perceive the real facts underneath, which would be perfectly apparent to any business layman of ordinary intelligence.

Now, in the present case, when we strip off the external dress in which this transaction has been clothed, and look at the substance of the matter, the following facts are, in our judgment, transparently manifest, viz.: That the construction company has acquired these lands in payment for building plaintiff's road, and holds the entire

beneficial interest in them as fully, to all intents and purposes, as if conveyed by deed absolute in form; that if the exemption from taxation is to continue, it will be for the exclusive benefit of the construction company; that no part of the commutation tax now paid by the Chicago, Milwaukee & St. Paul Railway Company out of the earnings of the road is paid in lieu of taxes on these lands; that the mere form of an organization of the St. Paul & Chicago Railway Company is kept up by the construction company for the sole purpose of holding the nominal fee of these lands. And for this there can be but one object, viz., to continue this exemption for the exclusive benefit of the construction company. The organization of the railway company, which is not in the exercise of a single franchise for which it was created, and which has no beneficial interest in the lands, is kept up in form by the construction company (by virtue of this valueless stock) for the sole purpose of holding a nominal equity of redemption, so that the real owner of the lands may hold under the guise of mere mortgagee, and thus evade taxation.

This is the necessary effect of this scheme, and it can be the only possible object in keeping it on foot. If the railway company had, in payment for building its road, sold, or contracted to sell, this land grant in a block by conveyance absolute in form, it would require no argument to show that these lands are taxable. In substance and effect, we think, the same thing has been done. In short, the evidence compels us to the conclusion that this transaction, although in *form* a mortgage, is in *substance* a conveyance, and was intended to operate as such. The state should and must, in letter and spirit, religiously keep its contract obligations; but the law will not tolerate the use of mere forms to evade its spirit. To continue the exemption of these lands from taxation would be a fraud upon the state, and contrary to the meaning and spirit of the statute. Our conclusion, therefore, is that the findings of fact and conclusions of law of the learned trial court are not justified by the evidence.

The order denying a new trial is reversed, and a new trial ordered.