STATE v. DULUTH, MISSABE & NORTHERN RAILWAY COMPANY AND ANOTHER.
STATE v. DULUTH & IRON RANGE RAIL ROAD COMPANY AND ANOTHER.
STATE v. SPIRIT LAKE TRANSFER RAILWAY COMPANY AND ANOTHER.

STATE v. OLIVER IRON MINING COMPANY.
STATE v. PROCTOR WATER & LIGHT COMPANY.[1]

April 26, 1940.

Nos. 32,124-32,126, 32,312, 32,313.

For original opinions, see 207 Minn. 618, 630.

[1]Reported in 292 N. W. 411.

*J. A. A. Burnquist,* Attorney General, and *John A. Pearson* and *Irving M. Frisch,* Special Attorneys, for the State.

*Elmer F. Blu, Clarence J. Hartley,* and *Kellogg, Morgan, Chase, Carter & Headley,* for railway companies, mining company, and water and light company.

PER CURIAM.

Due to the fact that in our original opinion, State v. D. M. & N. Ry. Co. 207 Minn. 618, 292 N. W. 401, we did not adopt *in toto* either the theory of the state or that of the defendants nor yet that of the trial court, we were reluctant to pass upon certain features which would have been more fully presented to us had counsel been aware of our views on the principal questions involved and to which we now adhere. Their position on these minor questions is now fully presented. The state now contends that

notwithstanding the principles announced in the original opinion it is entitled to a tax under L. 1933, c. 405.

Some confusion has arisen in the discussion of the issues here involved due to the use of the phrase "nonoperating income" by the tax commission and in the briefs. Doubtless that phrase may be used in different senses, but it is not appropriate to distinguish nonrailroad income from that derived from the exercise of the corporate franchise for railroad purposes. To avoid confusion for tax purposes, the distinction should lie between income derived from the exercise of the franchise within the scope of railroad ownership or operation and that from its exercise without such scope. For convenience, we deem it better in discussing the issues before us to use the phrases "railroad income" and "nonrailroad income."

The state computes the aggregate combined net taxable income of all subsidiaries at $2,244,985.86, in arriving at which total it has calculated the net taxable income of the Missabe at $2,985,838.59 and of the Iron Range at $391,971.92 and has not included in deductions the deficits which it claims are due to mining operations on account of c. 405, § 5b.

It is the contention of the state that whatever was not reported as taxable gross earnings must necessarily be income taxable under c. 405, but we are not concerned in the case at bar with the question of what was properly taxable as gross earnings or reported as such or found to be gross earnings by the trial court. We are concerned solely with what is and what is not taxable net income under c. 405. In the case of the railroads it is determined by what is not railroad income.

1. The largest item the state contends to be taxable is $1,966,-547.58 of accretions and interest on the funds paid to the Interstate Commerce Commission under the transportation act and which together with the principal sum was paid back to the railroads in 1933. We did not pass on this item in our original opinion, but in view of the state's computation we now do so. It is obvious to us that the accretions and interest did not derive from the exercise of the corporate franchises for other than rail-

road purposes. The companies were compelled by law because they owned or operated railroads to pay part of their railroad earnings into this fund. The accretions and interest ensued as a result. They are necessarily and obviously a result of the exercise of the corporate franchises in the ownership or operation of railroads. To state the situation is to answer the contention. Had it not been for the exercise of the franchise for railroad purposes these funds would not have been accepted or repaid by the government.

2. The next largest item is that of interest paid the companies by the United States Steel Corporation on deposits with that corporation. The deposit was large in the case of the Missabe, running to 33 millions in 1933. The withdrawals for operating expenses, materials, and taxes ran from $100,000 to $600,000 a month, and there were dividend withdrawals in amounts not called to our attention. A plan was on foot to purchase the Iron Range Rail Road, which had some eight millions in outstanding bonds. The government's repayments aggregating some 10 millions went into the fund. It cannot be said that the interest so earned was outside the exercise of the franchises for railroad purposes nor that the funds so deposited had become characterized as an investment to produce interest within the holdings in State v. N. P. Ry. Co. 139 Minn. 473, 167 N. W. 294, and State v. G. N. Ry. Co. 139 Minn. 469, 167 N. W. 297. The interest on bank deposits falls within the same category. Working capital is as necessary to railroad operations as cars or engines.

3. The houses rented and sold to employes appear to be such as would not otherwise have been available and were built in order to provide habitations for the employes at a place convenient to work. The rent and interest on purchase price, therefore, were funds arising out of the exercise of the franchise for railroad purposes.

4. The state earnestly contends that it was not permitted in the trial court to challenge the correctness of the returns of the affiliated corporations. The trial court ruled out such evidence partly because of its ruling upon the question of combined return

and partly because they were considered inadmissible under c. 405, but allowed the state to make offers of proof. The court took the position that such returns could not be challenged in a suit under the act until the tax commission had, under c. 405, § 43, examined and investigated the taxpayer's return and, if found incorrect, computed the proper tax. We think the court was right in so ruling. C. 405, § 36, provides that the taxpayer's return shall be deemed the assessment subject to revision. Section 43(a) provides that the tax computed by the commission after examination and investigation "shall be the tax to be paid by such taxpayer." Section 44 provides for computation of the tax where the taxpayer makes no return or a false or incorrect one. Section 45(a), under which these suits were brought, provides for the commencement of an action to recover the tax by filing with the clerk of the district court "an itemized summary of the taxable net income on the basis of which the tax has been computed." Abundant power was, by these provisions, placed in the commission to obtain a computation of the tax upon any theory it might entertain. Obviously the provisions were calculated to require a computation by the commission of its claims, and notice to the taxpayer prior to the bringing of an action under § 45. The computation of the tax thus becomes the very foundation of the action. Here a combined return including the affiliates was made and amended. This return was subject to the examination, investigation, and correction contemplated by the statute before an action should have been commenced. As we understand the record, no recomputation by the commission setting out its present claims under the sections cited had been made when the returns were sought to be attacked in this action. In justice to any taxpayer, individual or corporate, the provisions of the statute must be followed so that he may know with what items of income the state seeks to charge him. This is but common fairness.

The nonmining income of the mining companies is now calculated by the state in its brief to be but $150,719.13, and the offers of proof made upon the trial, after deducting intercompany dividends and items of interest which must be considered returns

from mining operations, amounted to but $152,162.11, which under the principles laid down in this and in the original opinion would not change the result if admitted and proved. The state claims that there are other items of income from nonmining income which it was not allowed to prove, but in our view of the statute all these items should have been computed by the commission as a foundation for the action under § 45. As we compute the net deficit from the figures in the state's brief, it is, in view of our holdings as to what is taxable under c. 405, something in excess of $900,000.

The petitions for rehearing are denied.

MR. JUSTICE PETERSON took no part.

