HMN FINANCIAL, INC., and
Affiliates, Relators,

v.

**COMMISSIONER OF REVENUE,**
Respondent.

No. A09–1164.

Supreme Court of Minnesota.

May 20, 2010.

Walter A. Pickhardt, Adam B. Thimmesch, Faegre & Benson LLP, Minneapolis, MN, for relator.

Lori Swanson, Attorney General, Rita Coyle DeMeules, Assistant Attorney General, St. Paul, MN, for respondent.

OPINION

ANDERSON, PAUL H., Justice.

■ This appeal arises out of a tax-change notice issued by the Minnesota Commissioner of Revenue to relators HMN Financial, Inc. and its affiliates. In the notice, relating to tax years 2002 through 2004, the Commissioner concluded that relators' business structure—a "captive REIT" [1]—lacked "economic sub-

---

1. A "captive REIT" is a business structure, explained in more detail below, in which a

stance" and "business purpose." Based upon this conclusion, the Commissioner disregarded relators' captive-REIT structure and attributed a substantial amount of additional income to them, raising their corporate franchise tax for 2002 through 2004 by approximately $2.5 million. The Minnesota Tax Court upheld the Commissioner's decision, and relators appealed to our court. On appeal, we must decide a single issue: whether the tax court erred when it held that the Commissioner had the statutory or common-law authority to disregard relators' captive-REIT strategy when they organized their businesses in compliance with relevant statutes but were motivated solely by a desire to reduce their taxes. We reverse.

HMN Financial, Inc., Home Federal Savings Bank, Osterud Insurance Agency, Inc., Home Federal REIT, Inc., and Home Federal Holding, Inc. (collectively HMN) were all members of the same unitary business under Minn.Stat. § 290.17, subd. 4(b) (2002),[2] during the tax years at issue—2002, 2003, and 2004. HMN was subject to Minnesota corporate franchise tax during those years and, as a unitary business, filed combined Minnesota tax returns each year.

HMN Financial, Inc. is a bank holding company that, during all relevant times, owned all of Home Federal Savings Bank's (HF Bank) outstanding stock. In 2002, HF Bank incorporated Home Federal Holding, Inc. (HF Holding) and Home Federal REIT, Inc. (HF REIT). Both HF Holding and HF REIT were initially wholly-owned, direct subsidiaries of HF Bank.

HF REIT qualified as a "real estate investment trust" under I.R.C. § 856 (2000) from 2002 through 2004. Real-estate investment trusts are entities that may receive income from only particular real-estate interests, including mortgages, and pay out most of their income to their shareholders as dividends. I.R.C. §§ 856, 857 (2000). Real estate investment trusts must have at least 100 shareholders. I.R.C. § 856(a)(5). Because they are allowed a tax deduction for the dividends they pay, real estate investment trusts are subject to very little tax under federal and Minnesota law. *See* I.R.C. §§ 561(a) (2000), 857(b)(2)(B); Minn.Stat. § 290.01, subd. 19(3) (2002).

In February 2002, HF Bank transferred to HF REIT interests in a number of real-estate loans with a total value of over $153 million. In exchange for the interests in the loans, HF REIT transferred 1,523 shares of its common stock to HF Bank. HF REIT continued to procure additional loan interests from HF Bank throughout 2002 and in subsequent years.

At the end of 2002, HF Bank transferred its 1,523 shares of HF REIT common stock to HF Holding in exchange for 100 shares of HF Holding common stock. This transaction made HF REIT a wholly-owned subsidiary of HF Holding. HF Holding then purchased from HF REIT 1,000 shares of HF REIT preferred stock. HF Bank purchased from HF REIT 112 shares of HF REIT preferred stock, which it distributed, one share each, to 112 HF Bank employees. This distribution to HF Bank employees allowed HF REIT to meet the real estate investment trust re-

corporation owns holding company, which in turn owns a real estate investment trust.

2.   Statutory citations in this opinion are generally to Minnesota Statutes 2002, which were

in force during the tax years at issue. The Legislature has since significantly amended a number of the relevant statutes.

quirement of having at least 100 shareholders.

HF Holding was part of a unitary business with HMN Financial, Inc. during the tax years at issue, but HMN did not include HF Holding on its combined tax report because HMN considered HF Holding to be a foreign operating corporation under Minnesota law. During the relevant tax years, Minnesota law required foreign operating corporations to be excluded from combined tax reports. Minn.Stat. § 290.17, subd. 4(f), (h) (2002). Minnesota law also defined a foreign operating corporation as a domestic corporation engaged in a unitary business with a Minnesota corporation. Minn.Stat. § 290.01, subd. 6b (2002). To be considered a foreign operating corporation, the average of the percentages of the corporation's tangible property and payroll assigned to locations inside the United States must be 20 percent or less. *Id.* HF Holding was a domestic corporation but was authorized to do business in the Cayman Islands. It held a sublease on office space in Grand Cayman and did not hold any interest in tangible property in the United States during the tax years at issue. HF Holding had one paid employee during the years at issue, and that employee worked exclusively in HF Holding's office in Grand Cayman.

In essence, HMN's organizational structure was as follows: HF Bank owned all of the shares of HF Holding, which was a foreign operating corporation; HF Holding owned all of the shares of HF REIT except for the 112 shares of preferred stock owned by HF Bank employees. As a unitary business, HMN reported its income as a group, but excluded HF Holding's income because it was a foreign operating corporation.

The Minnesota tax benefits to HMN based on the foregoing organizational structure were considerable. During the tax years at issue, HF REIT earned income from the interests in real-estate loans that it held. HF REIT paid all of its taxable income as dividends to both its common and preferred shareholders—i.e., HF Holding and the 112 HF Bank employees. HF Holding, in turn, used the income it received as dividends from HF REIT to pay dividends to its sole shareholder, HF Bank. Under Minnesota law, real estate investment trusts are entitled to a tax deduction for dividends paid. Minn.Stat. § 290.01, subd. 19 (2002) (referencing I.R.C. §§ 561(a) and 857(b)(2)(B)). HF REIT took such a deduction and thus had close to zero net taxable income in Minnesota. HMN did include HF REIT on its combined tax report.

Because HMN treated HF Holding as a foreign operating corporation, HMN did not include HF Holding's income on its combined tax report for Minnesota in any of the tax years at issue. But, consistent with Minnesota law, HMN claimed "deemed dividends" on each combined report equal to the adjusted net income of HF Holding. *See* Minn.Stat. § 290.17, subd. 4 (2002). These deemed dividends amounted to approximately $8.6 million in 2002, $10.1 million in 2003, and $15.8 million in 2004. Under Minnesota tax law, certain dividends received—including deemed dividends from a foreign operating corporation—entitle a company to a tax deduction equal to 80 percent of those dividends. HMN claimed this 80 percent deduction in the amounts of approximately $6.9 million in 2002, $8.1 million in 2003, and $12.6 million in 2004.

As a direct result of the structuring of its business—sometimes referred to as a "captive REIT" structure—HMN essentially paid corporate franchise tax on only 20 percent of its income from the loan interests it transferred from HF Bank to

HF REIT. This structuring resulted in considerable Minnesota tax savings for HMN.

The Minnesota Commissioner of Revenue, in a tax-change notice dated February 12, 2007, decided that HMN's business-structure arrangements lacked "economic substance" or "business purpose" and therefore the Commissioner decided to ignore HMN's business structure for tax purposes. The Commissioner then made an alternative decision that HF Holding did not qualify as a foreign operating corporation. As a direct result of these decisions, the Commissioner determined that HMN had significantly understated its income attributable to Minnesota and consequently underpaid its Minnesota taxes. The Commissioner ordered that HMN pay additional taxes, adding interest as allowed by law, in the approximate amount of $2.5 million.

HMN appealed to the tax court and requested a trial. After conducting a trial, the tax court made findings of fact and concluded that the Commissioner "has the authority to disregard transactions that have no genuine business purpose and are intended to avoid Minnesota tax." The court disallowed the transactions between HF Bank, HF REIT, and HF Holding because the transactions "had no economic substance and no genuine business purpose except to avoid Minnesota tax." Accordingly, the court affirmed the Commissioner's order that HMN pay additional tax. The court also made findings that HF Holding met the statutory requirements of a foreign operating corporation. HMN appealed the tax court's decision to our court.

## I.

We uphold a tax-court ruling when there is sufficient evidence in the record for the tax court to reasonably reach its conclusion. *Green Giant Co. v. Comm'r of Revenue,* 534 N.W.2d 710, 711 (Minn.1995). But we review the tax court's legal conclusions—including interpretation of statutes—de novo. *Chapman v. Comm'r of Revenue,* 651 N.W.2d 825, 830 (Minn.2002).

The parties imply the existence of two factual disputes in this case, but these disputes are easily resolved. First, HMN complains that the tax court's findings disregarded a stipulated fact—that HMN was motivated in setting up its captive REIT strategy "to reduce its interest rate exposure" in addition to avoiding Minnesota taxes. HMN implies that this additional, stipulated motivation gives economic substance to its captive REIT structure. Thus, HMN contends that, even if the Commissioner has authority to tax according to economic substance, HMN should still prevail. But the court found that HMN was motivated solely to avoid taxes. We give significant deference to the court's findings. Moreover, a review of the evidence in the record strongly supports the tax court's finding that HMN was motivated solely by tax avoidance. Also, HMN admits in its brief that it does not challenge the court's findings on this point and that this case involves only an issue of law.

As to the second possible factual dispute, the Commissioner implies that HF Holding does not meet the statutory definition of a foreign operating corporation, and therefore the Commissioner should prevail. The Commissioner's implications, however, are at odds with the tax court's findings. In order to qualify as a foreign operating corporation during the tax years at issue, HF Holding must: (1) be part of a unitary business, at least one member of which was taxable in Minnesota, and (2) have the average of the percentages of its tangible property value and payroll assigned to locations inside the United

States be 20 percent or less. Minn.Stat. § 290.01, subd. 6b.[3] The parties stipulated that HF Holding met these requirements. Nevertheless, the Commissioner implies that HF Holding may not meet the definition of a foreign operating corporation because some of HF Bank's officers, located in the United States, worked for free on behalf of HF Holding.

The Commissioner implies that if the HF Bank officers had been paid for their services to HF Holding, the average of HF Holding's tangible property value and payroll in the United States may have exceeded 20 percent. But the tax court found that HF Holding did not assign any payroll or tangible property value inside the United States, and therefore held that HF Holding met the definition of a foreign operating corporation. As previously noted, we give the tax court's factual findings, on which this holding is predicated, significant deference. Further, the Commissioner does not assert what the value of the free services might have been or demonstrate that services, if paid for, would have pushed the average taxable United States property value and payroll above 20 percent of HF Holding's total taxable property value and payroll.

Consequently, we conclude that the implied factual disputes the parties allude to in their briefs are without merit and we must decide only a single, legal issue—whether the Commissioner has the authority to attribute income and assess taxes to a business that structured itself to comply with the letter of the relevant tax statutes but was motivated to do so solely by tax avoidance.

## II.

We now turn to the sole issue in this case. In our analysis, we first address HMN's argument that *Hutchinson Technology, Inc. v. Commissioner of Revenue* (*Hutchinson*), 698 N.W.2d 1 (Minn.2005), resolves the issue before us. Then we will address whether the Commissioner has the authority that he claims is granted to him under Minn.Stat. §§ 289A.35, 290.07, subd. 2, 290.20, subd. 1, and 290.34, subds. 1 and 2 (2002). Finally, we will address whether the Commissioner has the claimed authority under the common law.

### A. Hutchinson Technology

HMN argues that we essentially already decided the issue before us when we decided *Hutchinson*. The Commissioner contends that *Hutchinson* is distinguishable. *Hutchinson* involved HTI Export, a "foreign sales corporation" (FSC)—an entity that gets favorable federal tax treatment—that also claimed status as a foreign operating corporation under Minnesota law. 698 N.W.2d at 3–4. Though HTI Export was (1) a wholly-owned subsidiary of Hutchinson Technology, (2) was a domestic corporation, and (3) the parties had stipulated that HTI Export had no tangible property or payroll within the United States, the Commissioner denied Hutchinson Technology the received-dividends deduction allowed for dividends deemed received from foreign operating corporations. *Id.* at 3, 5, 7.

In *Hutchinson* we addressed two issues relevant to this case. First, in response to the Commissioner's argument that HTI Export did not qualify as a foreign operating corporation because it did not have any

---

**3.** Minnesota Statutes § 290.01, subd. 6b has an additional requirement—that the corporation not be a foreign sales corporation—but we found that provision unconstitutional in *Hutchinson Technology, Inc. v. Commissioner*

*of Revenue,* 698 N.W.2d 1, 18 (Minn.2005), and regardless, the provision is irrelevant in this case as HF Holding is not a foreign sales corporation.

"operations," we concluded "that the language of [the statute defining foreign operating corporations, Minn.Stat. § 290.01, subd. 6b,] does not require operations in the sense argued by the Commissioner, and we will not add requirements to the statute beyond those specified by the legislature." *Hutchinson*, 698 N.W.2d at 8 (citing *Green Giant*, 534 N.W.2d at 712). But that issue is different than the one we face here—whether the Commissioner has authority to deny foreign-operating-corporation tax treatment to HMN despite the fact that HF Holding meets the statutory definition of a foreign operating corporation.

Despite this difference, we conclude that our *Hutchinson* holding has some significance to our analysis because, in *Hutchinson*, we rejected the Commissioner's argument that foreign operating corporations must satisfy requirements—namely requirements for actual operations—in addition to the bare statutory requirements. *See id.* at 8. Here the Commissioner's argument and the tax court's holding—that foreign operating corporations must have economic substance or business purpose—appear to be something of a reprise of the Commissioner's earlier operations-requirement argument that we rejected in *Hutchinson.* Indeed, in *Hutchinson* we emphasized that we would not add any requirements for foreign operating corporation status beyond minimal statutory compliance. *See id.* We stated, albeit in dicta, that: "Given [the] minimal requirements for [a foreign operating corporation], there is nothing to prevent any [foreign operating corporation] from being an empty shell entity, existing solely to provide tax exemptions, no different in nature from a FSC." *Id.* at 16.

We addressed a second relevant issue in *Hutchinson* when we rejected the Com-

missioner's argument that fee transactions between HTI Export and Hutchinson Technology lacked "business purpose," and as a result they were disqualified from foreign operating corporation tax treatment. *See id.* at 11–12. We held that the relevant statute required only that "fees" be paid in order to qualify for the tax treatment and that the definition of fees did not include a business-purpose requirement. *Id.* Here, as in *Hutchinson*, we face an argument by the Commissioner that seeks to add a "business purpose" test to a statute dealing with foreign operating corporation tax treatment. In *Hutchinson* we declined to do so, stating that we were "unwilling to write into a statute what the legislature did not." *Id.* at 12 (citing *Green Giant*, 534 N.W.2d at 712).

As the Commissioner points out, the parallels between the present case and *Hutchinson* are not exact, but *Hutchinson* does inform our analysis of the present case. In *Hutchinson*, we were unwilling to add requirements to statutes allowing preferential foreign operating corporation tax treatment if those requirements were not explicitly included in the statute by the legislature. With the *Hutchinson* decision in mind, we will next address the Commissioner's claim that he has statutory authority to attribute income and assess tax to HMN despite HMN having complied with the letter of relevant tax statutes allowing sizable deductions, motivated only by tax avoidance.

### B. *Claimed Statutory Authority*

■ The Commissioner asserts that several Minnesota statutes combine to vest him with sweeping statutory authority to disregard tax-avoidance business structures like the one employed by HMN. HMN contends that while the statutes cited by the Commissioner do grant him some discretion, such discretion is limited

to specific situations and does not apply in this case.

■■■■ The Commissioner first claims authority under Minn.Stat. § 289A.35, which states in relevant part:

> The commissioner has the authority to make determinations, corrections, and assessments with respect to state taxes, including interest, additions to taxes, and assessable penalties.

The Commissioner then cites a case for the proposition that section 289A.35 grants him "[a]bundant power" to compute "tax upon any theory [he] might entertain." *State v. Duluth, Missabe & N. Ry. Co.* (*Duluth*), 207 Minn. 637, 641, 292 N.W. 411, 413 (1939). But *Duluth* makes clear what the Commissioner's "abundant power" entails. It is a power to *compute* tax in accordance with Minnesota law and then *challenge a taxpayer's returns in court* if the Commissioner believes that taxpayer has reported its taxes incorrectly. *See id.* Such a reading comports with common sense. Surely the Commissioner's "determinations, corrections, and assessments" are not the final word on how much tax an entity must pay. If they were, neither this nor any tax case would ever come before the tax court, let alone our court. Rather, we conduct a de novo review of all matters of law at issue in a tax case. *See Chapman v. Comm'r of Revenue*, 651 N.W.2d 825, 830 (Minn.2002). We conclude, therefore, that section 289A.35 does not grant the Commissioner the sweeping power he claims in this case.

■■■ The Commissioner next claims authority under Minn.Stat. § 290.07, subd. 2. That section provides, in relevant part:

> [N]et income and taxable net income shall be computed in accordance with the method of accounting regularly employed in keeping the taxpayer's books. If no such accounting system has been regularly employed, or if that employed does not clearly or fairly reflect income or the income taxable under this chapter, the computation shall be made in accordance with such method as in the opinion of the commissioner does clearly and fairly reflect income and the income taxable under this chapter.

*Id.* By its plain language, section 290.07, subd. 2, is about methods of accounting. *See Duluth*, 207 Minn. at 627, 292 N.W. at 406 (stating that an earlier version of the section was "aimed exclusively at methods of accounting"). The statute provides that, if an accounting method employed by a taxpayer does not fairly reflect income, the Commissioner may compute tax according to a different method of accounting.

The tax court in the case before us made no finding that HMN used a flawed accounting method in computing its taxable income. At trial, HMN's accounting expert testified that HMN kept records regarding its captive REIT strategy according to generally accepted accounting principles. The Commissioner does not assert that HMN used an improper accounting method or that the generally accepted accounting principles used by HMN failed to fairly reflect its taxable income. Rather, the Commissioner's issue appears to be with the result reached when accounting methods allowed by statute were employed. We conclude that section 290.07, subdivision 2, does not grant the Commissioner the power to disregard HMN's structure and to tax HMN as the Commissioner sees fit.

■■■ The Commissioner also claims authority to attribute income and assess taxes to HMN under Minn.Stat. § 290.20, subd. 1. This provision deals with the allocation of taxable income among states for corporations doing business in more than

one state. *See id.* Subdivision 1 provides, in relevant part:

> The methods prescribed [for allocation of taxable income] by section 290.191 shall be presumed to determine fairly and correctly the taxpayer's taxable net income allocable to this state. If the methods prescribed by section 290.191 do not fairly reflect all or any part of taxable net income allocable to this state, the taxpayer may petition for or the commissioner may require the determination of net income by the use of another method, if that method fairly reflects net income.

*Id.* Minnesota Statutes § 290.20, subd. 1, by its plain language, includes a presumption that a taxpayer has "fairly and correctly" determined its Minnesota taxable income if that taxpayer used the reporting methods outlined in section 290.191. Section 290.20, subdivision 1, conditions any authority granted to the Commissioner on "the methods prescribed by section 290.191" failing to fairly reflect taxable net income in Minnesota. *Id.* Importantly, the Commissioner makes no assertion or argument that HMN did not properly follow "the methods prescribed by section 290.191," nor does the Commissioner make any attempt to rebut the presumption that those methods produce fair and correct results. Rather, the Commissioner appears to take issue with the result rather than the methods HMN used to reach that result. We thus conclude that section 290.20, subdivision 1 does not grant the Commissioner the authority to attribute income and assess taxes he claims.

■ The Commissioner also claims authority under Minn.Stat. § 290.34, subd. 2, which provides that the Commissioner may "require such combined report as, in the commissioner's opinion, is necessary in or-

der to determine the taxable net income of any one of the affiliated or related corporations." The issue before us, however, is not whether the Commissioner had authority to require a different combined report, but whether he had authority to disregard HMN's captive REIT structure in assessing HMN's income and taxes.

■ Indeed, in arguing that the foregoing four provisions—Minn. Stat. §§ 289A.35; 290.07, subd. 2; 290.20, subd. 1; and 290.34, subd. 2—grant him statutory authority to disregard HMN's captive REIT strategy, the Commissioner does not appear to argue that any one of the provisions alone grants him the authority he claims. Rather, the Commissioner essentially argues that the four provisions, taken together, add up to a broad grant of authority to close statutory tax loopholes. This argument is not convincing, especially in light of the issue raised in this case. HMN complied with the requirements of all relevant statutes in structuring its business. The Commissioner does not dispute this point, but instead the Commissioner would have us allow him to ignore HMN's statutory compliance based on the amorphous authority that he argues is created by a series of other statutes. But for all the previously stated reasons, we decline to do so.

■ Finally, the Commissioner argues that Minn.Stat. § 290.34, subd. 1, grants him authority to act as he did. Section 290.34 subdivision 1, upon which the tax court relied heavily, states, in relevant part:

> [*clause 1*] [4] When any corporation liable to taxation under this chapter conducts its business in such a manner as, directly or indirectly, to benefit its mem-

---

**4.** We divide the section into clauses because it is helpful in discussing HMN's arguments, which make reference to clause 1, clause 2, and clause 3.

bers or stockholders or any person or corporation interested in such business or to reduce the income attributable to this state by selling the commodities or services in which it deals at less than the fair price which might be obtained therefor, or buying such commodities or services at more than the fair price for which they might have been obtained,

[*clause 2*] or when any corporation, a substantial portion of whose shares is owned directly or indirectly by another corporation, deals in the commodities or services of the latter corporation in such a manner as to create a loss or improper net income or to reduce the taxable net income attributable to this state,

[*clause 3*] the commissioner of revenue may determine the amount of its income so as to reflect what would have been its reasonable taxable net income but for the arrangements causing the understatement of its taxable net income or the overstatement of its losses, having regard to the fair profits which, but for any agreement, arrangement, or understanding, might have been or could have been obtained from such business.

The Commissioner argues that he had authority to disregard HMN's captive REIT structure under clause 1 of subdivision 1, because HF Bank gave HF Holding the free services of some of HF Bank's officers. HMN responds to this argument by asserting that the services in question were de minimis and therefore should not trigger clause 1. HMN also argues that, even if the free services did trigger clause 1, the Commissioner's only remedy under clause 3 was to assign a reasonable value to the free services.

The parties appear to agree that the free services HF Bank's officers performed for HF Holding are "services" that were sold for purposes of section 290.34, subdivision 1. Contrary to HMN's arguments, even if the services were as minimal as HMN claims, they had some value greater than zero. Because HF Bank reduced its income by giving away free services, these services triggered clause 1. But, as HMN argues, the plain language of clause 3 limits the remedy that the Commissioner has to correct HF Bank's "selling" its employees' "services ... at less than the fair price which might be obtained therefor." § 290.34, subd. 1.

Clause 3 specifically provides that, to correct a violation under the rest of subdivision 1, the Commissioner "may determine the amount of [a corporation's] income so as to reflect what would have been [that corporation's] reasonable taxable income but for the arrangements causing the understatement of [that corporation's] taxable net income...." *Id.* Here, if HF Bank understated its income, it did so only by an amount equal to the actual value of the services that its officers gave away. The Commissioner apparently made no attempt to ascertain the value of those services, nor did he purport to adjust HMN's taxable net income by an amount equal to their value. Rather, the Commissioner disregarded HMN's captive REIT structure altogether and assessed taxes to HMN as if that structure was never in place. These actions by the Commissioner are not authorized by the plain language of clause 3. Therefore, we conclude that the remedy sought by the Commissioner is outside of the authority granted to him under clause 3 of section 290.34, subdivision 1.[5]

---

**5.** The Commissioner could have ascertained the value of any free services and attributed that value to HF Holding as payroll costs. *See* Minn.Stat. § 290.24, subd. 1. Doing so might have rendered HF Holding ineligible to claim the status of a foreign operating corporation. But the Commissioner neither ascertained nor attributed the value of any free

Additionally, the Commissioner argues that he had statutory authority to disregard HMN's captive REIT structure because HF Bank transferred interests in loans to HF REIT triggering clause 1 of section 290.34, subdivision 1. As mentioned above, clause 1 is triggered when a corporation sells "services" at other than "a fair price." HMN concedes that the loans are services under section 290.34, subdivision 1, and it is uncontested that HF Bank sold interests in those loans to HF REIT. Thus, clause 1 would have been triggered if HF Bank sold the loans at other than a fair price. The only finding the tax court made with respect to the price at which HF Bank sold loan interests to HF REIT was a finding that the agreement between the two required that the "interest in the loans purchased by the REIT would be the fair market value...." At trial, the Commissioner never challenged the fairness of the price of the loan interests, nor does he challenge the fairness of the prices now. Rather, the Commissioner emphasizes that the profits from the loans in this case were passed on from HF REIT to HF Holding, and finally to HF Bank. This sequence of events is true and uncontested; but these facts are not relevant to Minn.Stat. § 290.34, subd. 1. Therefore, we conclude that the Commissioner's arguments that HMN's transfer of loan interests triggers clause 1 lack merit.

The Commissioner also argues that HF Bank's sale of loan interests to HF REIT, and the flow of the profits to HF Bank from those interests, triggers clause 2 of subdivision 1. Clause 2 is triggered,

> when any corporation, a substantial portion of whose shares is owned directly or indirectly by another corporation, deals in the commodities or services of the latter corporation in such a manner as to

create a loss or improper net income or to reduce the taxable net income attributable to this state....

Minn.Stat. § 290.34, subd. 1. In essence, the Commissioner argues that clause 2 applies because HF Holding, which is wholly owned by HF Bank, and HF REIT, which is essentially wholly owned by HF Holding, dealt in the services of HF Bank in such a manner as to reduce its taxable net income attributable to Minnesota. While HMN concedes that loans can be "services" for the purposes of section 290.34, subdivision 1, it does not appear that HF Holding and HF REIT *dealt* in those services and neither party squarely addresses this issue. The only action that an affiliate of HMN took that could be construed as "dealing" in the loan interests at issue is when HF Bank sold its loan interests to HF REIT.

But if HF Bank sold loan interests to HF REIT at other than a fair price, thereby triggering clause 1 or 2 of section 290.34, subdivision 1, the Commissioner's remedy is limited by clause 3. As discussed above, clause 3 states that if either clause 1 or 2 is triggered, the Commissioner "may determine the amount of [a corporation's] income so as to reflect what would have been [that corporation's] reasonable taxable income but for the arrangements causing the understatement of [that corporation's] taxable net income...." As applied here, clause 3 grants the Commissioner the power to determine a fair price for the loan interests and then to assign income to HF Bank, and subtract income from HF REIT, in an amount equal to the difference between the fair price and the price for which the loan interests actually sold. Indeed, this is what happened in the only case in which we have interpreted section 290.34, subdivision 1—*Addison*

services. Moreover, deferring to the tax court, we accept that court's finding that HF

Holding did, in fact, qualify as a foreign operating corporation. *See supra* at 563–64.

*Miller, Inc. v. Commissioner of Taxation* (*Addison*), 249 Minn. 24, 81 N.W.2d 89 (1957).

*Addison* involved two businesses, a corporation and a partnership, both owned by the same people. *Id.* at 24–25, 81 N.W.2d at 90. The corporation rented equipment to the partnership at a low rate and gave the partnership an interest-free loan. *Id.* at 25, 81 N.W.2d at 90. The Commissioner determined the fair rental value of the equipment and a fair interest rate for the loan. *Id.* at 25–26, 81 N.W.2d at 90. Acting under the authority granted to him by section 290.34, subdivision 1, the Commissioner then increased the corporation's taxable net income to reflect the fair values that should have been paid. *Id.* Our decision in *Addison* upheld the Commissioner's action. *Id.* at 29, 81 N.W.2d at 92.

In *Addison*, the Commissioner did not disregard the taxpayers' business structure—the fact that one business was a corporation and the other was a partnership. He merely corrected the pricing in the questioned transactions and corrected the businesses' incomes accordingly. Here the Commissioner claims authority to disregard HMN's business structure entirely. Consistent with *Addison*, if the Commissioner believed the loan interests were sold at other than a fair price, the Commissioner could have corrected the selling price of the loan interests and adjusted HF Bank's and HF REIT's incomes accordingly. But the Commissioner does not allege that the loan interests were sold at other than a fair price, and the tax court made no such finding. Thus, on the facts in this case, we conclude that section 290.34, subdivision 1 does not give the Commissioner the authority he claims.

Moreover, as HMN points out, it is important to note that nothing in section 290.34, subdivision 1 or any of the other statutes under which the Commissioner claims authority for his action, expressly gives the Commissioner the authority to override other statutes. Indeed, the Commissioner does not cite any authority addressing the issue of whether the Commissioner can tax according to substance rather than form when a taxpayer has structured its business to be in full compliance with the relevant tax statutes. HF Holding qualifies as a foreign operating corporation, and the Commissioner does not challenge the tax court's findings on this point. During the tax years at issue, foreign operating corporations received beneficial tax treatment under Minnesota statutes. The Commissioner clearly dislikes the tax consequences that occur under the relevant statutes, but it is for the legislature, not the Commissioner, to change the law that creates such consequences. Indeed, the legislature did just that when it changed the definition of a foreign operating corporation in 2005 to do away with the captive REIT strategy. *See* Act of July 13, 2005, 1st Spec. Sess., ch. 3, art. 3, § 5, 2005 Minn. Laws 2273, 2321. In sum, we conclude that none of the statutes cited by the Commissioner give him the authority to disregard HMN's captive REIT business structure.

### C. Common Law Authority

■ Finally, we turn our attention to the question of whether our common law gives the Commissioner the authority he asserts here. The Commissioner cites a number of our cases for the proposition that he has the broad authority to tax according to substance rather than form. But none of these cases embraces the radical position that the Commissioner may disregard statutes that allow certain business structures favorable tax treatment.

Rather, those cases emphasize the proper role of our court to construe the relevant statutes to determine if a taxpayer is in compliance with those statutes.[6] If Minnesota statutes allow a favorable tax treatment, neither our court nor the Commissioner has the power to disregard those statutes and impose a different tax treatment. And, if we conclude a taxpayer has complied with the relevant statutes, that ends our analysis. *See Stretar Masonry Co. v. Comm'r of Revenue*, 518 N.W.2d 29, 32–33 (Minn.1994). Here, we conclude that HMN complied with the relevant tax statutes.

It is evident that the Commissioner disfavors the tax treatment HMN received. He has attacked the validity of that tax treatment from every conceivable angle. But the fact remains that HMN complied with the tax statutes in structuring its business, and those statutes, as they existed during the relevant tax years, allowed the favorable tax treatment HMN received.

We hold that neither Minnesota statutes nor case law grants the Commissioner the power to disregard HMN's business structure in assessing HMN's taxes. When a business complies with all of the relevant tax statutes, that business is subject to tax in accordance with those statutes. Here HMN's captive REIT structure complied with relevant statutes during the tax years at issue, and HMN is subject to the taxation only as laid out in those statutes. Therefore, we hold that the tax court erred when it concluded that the Commissioner possessed both statutory and common law authority to disregard HMN's captive REIT structure despite the fact that HMN complied with relevant tax statutes in structuring its business and reporting its income.

Reversed.

---

6. *Bond v. Comm'r of Revenue*, 691 N.W.2d 831, 837–39 (Minn.2005) (holding that the Social Security Administration did not establish a trust for an individual taxpayer and therefore that taxpayer was subject to Minnesota tax); *Comm'r of Revenue v. Safco Prods. Co.*, 266 N.W.2d 875, 876–78 (Minn.1978) (holding that a business was entitled to a sales and use tax exemption under one relevant statute but not another); *Midwest Fed. Sav. & Loan Ass'n v. Comm'r of Revenue*, 259 N.W.2d 596, 599 (Minn.1977) (holding that because a business structured itself in a certain manner it was subject to tax in accordance with its structure); *Transp. Leasing Corp. v. State*, 294 Minn. 134, 139–40, 199 N.W.2d 817, 820–21 (1972) (holding that a taxpayer validly elected a tax exemption under the applicable statute); *Minn. Tribune Co. v. Comm'r of Taxation*, 228 Minn. 452, 455–61, 37 N.W.2d 737, 738–41 (1949) (holding that a foreign corporation was "doing business" in Minnesota within the meaning of the relevant tax statute and was thus subject to Minnesota tax); *Sanders v. Comm'r of Taxation*, 222 Minn. 186, 186–93, 23 N.W.2d 565, 565–69 (1946) (holding that not-yet-mature bond interest may be treated as income of a donor for taxation purposes); *In re Estate of Marshall*, 179 Minn. 233, 233–45, 228 N.W. 920, 920–25 (1930) (holding that a transfer of property in trust vested immediately rather than at death and should be taxed accordingly); *St. Paul & Chi. Ry. Co. v. McDonald*, 34 Minn. 195, 204–09, 25 N.W. 453, 454–57 (1885) (holding that while a railroad company held legal title to property, another company held all beneficial interest, and therefore the property was not exempt from taxation under an exemption for the railroad company).