STATE OF MINNESOTA

IN SUPREME COURT

A24-1601

Tax Court

E. I. duPont de Nemours and Company & Subsidiaries,

Relator,

vs.

Commissioner of Revenue,

Respondent.

McKeig, J.
Took no part, Thissen, J.

Filed: August 27, 2025
Office of Appellate Courts

———————————————

Nicole L. Johnson, Melanie L. Lee (pro hac vice), Blank Rome LLP, New York, New York, for relator.

Keith Ellison, Attorney General, Jennifer A. Kitchak, Assistant Attorney General, Saint Paul, Minnesota, for respondent.

———————————————

S Y L L A B U S

The tax court correctly found that the Commissioner of Revenue satisfied his burden under Minnesota Statutes section 290.20 (2024) by demonstrating that the general apportionment method in section 290.191 (2024) misrepresented appellant's Minnesota activities, and that an alternative formula—excluding gross receipts but including net income from forward exchange contracts—fairly represented appellant's Minnesota activities.

Affirmed.

1

# OPINION

MCKEIG, Justice.

E. I. duPont de Nemours and Company & Subsidiaries (DuPont) is a multinational company with lines of business in approximately 90 countries. Because DuPont conducted some, but not all, of its business activities in Minnesota in 2013, 2014, and 2015 (the "years in dispute"), DuPont's sales attributable to Minnesota in those years must be apportioned. Under Minnesota law, there is a default method for apportioning sales found in Minnesota Statutes section 290.191 (2024),[1] but the Commissioner of Revenue ("Commissioner") may apply an alternative method under Minnesota Statutes section 290.20 (2024) if he shows that the default method does not fairly attribute income to Minnesota and that the alternative method does so. The question here is whether the Commissioner met the burden necessary to use an alternative apportionment method. The main dispute is how to apportion the receipts earned from forward exchange contract ("FEC") transactions; a hedging technique used by DuPont to protect its outstanding balances from foreign currency exchange risks. We conclude that the tax court did not err, and we affirm.

---

[1] Although Minnesota Statutes section 290.191 has been amended since the years in dispute, we cite to the current version of the statute since none of those amendments have any bearing on the tax dispute here.

**FACTS**

*Minnesota Tax Apportionment Method*

Minnesota's corporate franchise tax applies to corporations that "engage in contacts with this state that produce gross income attributable to sources within this state." Minn. Stat. § 290.02 (2024). When an entity conducts business partially within and partially outside of Minnesota and that entity is a unitary business,[2] "the entire income of the unitary business is subject to apportionment" for tax purposes. Minn. Stat. § 290.17, subd. 4(a) (2024). Apportionment is "an approximation of a corporation's income that is reasonably related to the taxing state" to ensure that states collect taxes on only their "fair share" of the business's income. *Caterpillar, Inc. v. Comm'r of Revenue*, 568 N.W.2d 695, 696–97 (Minn. 1997).

Minnesota Statutes section 290.191 contains the general apportionment formula. Apportionment is calculated using a company's sales factor ("Sales Factor").[3] Minn. Stat. § 290.191, subd. 2. The Sales Factor includes "all sales, gross earnings, or receipts

---

[2] The term "unitary business" means "business activities or operations which result in a flow of value between them. The term may be applied within a single legal entity or between multiple entities and without regard to whether each entity is a sole proprietorship, a corporation, a partnership or a trust." Minn. Stat. § 290.17, subd.4(b) (2024).

[3] The general apportionment formula in section 290.191 includes a sales factor, a payroll factor, and a property factor. Minn. Stat. § 290.191, subd. 2. For taxable years beginning in 2014 and later, however, by statute, the property and payroll factor percentages are both zero. *Id.* Now the only component—and only component at issue—is the Sales Factor. *Id.* Although one year in dispute, 2013, would have required consideration of the property and payroll factors, the dispute here involves only the Sales Factor.

received in the ordinary course of the business" except for enumerated exceptions not relevant to this dispute. *Id.*, subd. 5. Calculating the Sales Factor involves dividing the company's sales in Minnesota ("Minnesota Sales") by total sales made in the given year ("Everywhere Sales"), resulting in a percentage, also referred to as the apportionment percentage. *Id.*, subd. 2(a). The formula is:

$$\frac{Minnesota\ Sales}{Everywhere\ Sales} = Sales\ Factor\ /\ Apportionment\ Percentage$$

The Sales Factor is then multiplied by the total net income of the business to calculate the net income apportionable to Minnesota, which the State taxes. *Id.*

Section 290.20 states that section 290.191 (the general apportionment method) creates a rebuttable presumption of "fairly and correctly [determining] the taxpayer's taxable net income allocable to this state." Minn. Stat. § 290.20. Minnesota statutes section 290.20, subdivision 1, allows the Commissioner to deviate (or a taxpayer to request deviation) from the general apportionment method if it does not "fairly reflect all or any part of taxable net income allocable to this state." To rebut the presumption that section 290.191 "fairly and correctly" calculated a taxpayer's allocable income, the party petitioning "must present substantial evidence that the [general] apportionment method does not 'fairly reflect all or any part of taxable net income allocable' to Minnesota, and that an alternative method does so." *Associated Bank, N.A. v. Comm'r of Revenue*, 914 N.W.2d 394, 403 (Minn. 2018) (quoting Minn. Stat. § 290.20, subd. 1).

### *DuPont, Foreign Currency Risk, and FECs*

DuPont is a multinational science and technology company that sells a wide range of products to a wide range of markets, including nutrition, health care, pharmaceuticals, agriculture, automotive, textile, home and construction, packaging, electronics, and transportation markets. As of December 31, 2015, DuPont had operations in approximately 90 countries and 60 percent of its consolidated net sales were made outside of the United States. DuPont is a unitary business that conducted some, but not all, of its business within Minnesota, so its income must be apportioned under Minnesota law.

DuPont conducted business in foreign currencies, but in line with Generally Accepted Accounting Principles (GAAP),[4] it must report all global earnings in U.S. dollars. Converting unrealized or outstanding payments into U.S. dollars subjects DuPont to foreign currency fluctuation risks that are based solely on the volatility of the foreign currency exchange market. This creates foreign currency risk, which can also obfuscate review of an international company's true value and business operations.

To mitigate fluctuations from foreign currencies (along with other risks), DuPont adopted a Corporate Financial Risk Management Policy and Corporate Financial Risk Management Guidelines. The Corporate Financial Risk Management Policy specifically associated with foreign currency risks states that "[t]he business objective of this [foreign currency] risk management program shall be to maintain an approximately balanced

---

[4]     GAAP are "the conventions, rules and procedures that define approved accounting principles at a particular time." *Great Lakes Gas Transmission L.P. v. Comm'r*, 638 N.W.2d 435, 439 n.6 (Minn. 2002). The source of GAAP is the Financial Accounting Standards Board. *Id.*

position in foreign currencies in order to minimize exchange gains and losses resulting from exchange rate changes, net of related tax effects." And the Corporate Financial Risk Management Guidelines state that "[d]erivatives may not be used for speculative purposes. Accordingly, such instruments are not authorized for use with intention to profit from expected changes in the fair value of the derivative . . . ." In line with these policies, DuPont's treasury department, headquartered in Delaware, engages in risk management strategies. None of the relevant treasury department conduct occurred in Minnesota.

One of DuPont's risk management derivatives for foreign currency risk is FECs. FECs are legally binding contracts whereby one party agrees to sell a currency in exchange for a different currency at an agreed future date at a fixed, negotiated exchange rate. DuPont typically contracts with financial institutions for FECs to protect income against foreign currency exposure. On the day the FEC settles—meaning the agreed-upon date on which the parties fulfill their obligations under the contract—DuPont gives the financial institution a set amount of foreign currency, and the institution provides a set amount of dollars according to the negotiated forward exchange rate, regardless of the daily market rate (the daily market rate is also called the spot exchange rate). To satisfy the FEC with the institution, DuPont often buys the foreign currency it owes from a second financial institution at the spot rate the day the contract is due. This exchange can result in a net zero, loss, or gain.

The parties do not dispute that DuPont engaged in FEC transactions in the ordinary course of business and the Sales Factor under the general apportionment formula in section 290.191 includes the gross receipts from FEC transactions. Minn. Stat. § 290.191,

6

subds. 2, 5. The parties disagree, however, on whether to use the general apportionment method including gross receipts from FEC transactions under section 290.191 or an alternative apportionment method under section 290.20 that allows DuPont only to record its net income from FEC transactions. DuPont's FEC transactions for the years in dispute are summarized below:

| A | B | C | D (*column C divided by column B equals column D*) |
|---|---|---|---|
| Tax Year Ended | Total Gross Receipts (including gross receipts from FECs during the tax years ending 12/31/2013 – 12/31/2015) | Gross Receipts from FEC Transactions | FEC Gross Receipts as a Percentage of DuPont Total Gross Receipts |
| December 31, 2013 | $91,096,500,130 | $64,622,559,835 | 70.94% |
| December 31, 2014 | $88,736,926,488 | $64,607,697,993 | 72.81% |
| December 31, 2015 | $64,657,573,794 | $47,626,900,571 | 73.66% |

| A | B | C | D (*column C divided by column B equals column D*) |
|---|---|---|---|
| Tax Year Ended | DuPont Total Income | Net FEC Gains/Income | FEC Receipts as a Percentage of DuPont Total Income |
| December 31, 2013 | $12,436,356,842 | $59,950,407 | 0.48% |
| December 31, 2014 | $14,421,114,276 | $647,489,427 | 4.49% |
| December 31, 2015 | $12,566,223,064 | $407,355,440 | 3.24% |

*Department of Revenue Proceedings*

DuPont timely submitted its corporate franchise tax returns for the years in dispute using the general apportionment method under section 290.191, meaning it included gross receipts from FEC transactions to calculate DuPont's taxes owed to Minnesota. The Minnesota Department of Revenue (the Department) conducted an audit of DuPont's corporate franchise tax returns and adjusted the returns, including using an alternative apportionment formula under section 290.20 that considered only net income, rather than gross receipts, from FEC transactions.

The Department issued a Tax Order on March 8, 2019, explaining the newly assessed tax due to these adjustments, and DuPont appealed on May 31, 2019.[5] An administrative appeals conference was held on May 21, 2020, and the Commissioner issued a Notice of Determination on Appeal on May 4, 2021, affirming the Department's assessment, less penalties. The Notice assessed DuPont's tax at $9,187,623 with interest of $2,275,722 (totaling $11,463,345).

*Tax Court Proceedings*

DuPont appealed to the tax court. The tax court held a hearing, and three expert witnesses (one for the Commissioner and two for DuPont) testified about whether gross receipts from FEC transactions should be included in calculating DuPont's Sales Factor and, if not, whether the alternative formula should be used.

---

[5] To be clear, the parties call the Department of Revenue's order a "tax order" in their stipulation of facts. It is different from the tax court's Order for Judgment and Findings of Fact, Conclusions of Law, and Order.

8

The tax court affirmed the Commissioner's use of the alternative apportionment formula. *E. I. duPont de Nemours and Co. & Subsidiaries v. Comm'r of Revenue*, No. 9485-R, 2024 WL 3152928, at *2 (Minn. T.C. June 24, 2024). Because neither this court nor the tax court had addressed tax apportionment for hedging activities like FEC transactions, the tax court began by summarizing the two most apposite Minnesota tax cases: *HMN Financial, Inc. v. Commissioner of Revenue*, 782 N.W.2d 558 (Minn. 2010), and *Associated Bank*, 914 N.W.2d at 394. Then the tax court reviewed cases from other jurisdictions that evaluated whether that state's general apportionment formula "fairly represent[ed]" the taxpayer's business activities in the state. *See Microsoft Corp. v. Franchise Tax Bd.*, 139 P.3d 1169, 1178–79 (Cal. 2006); *Gen. Mills, Inc. v. Franchise Tax Bd.*, 146 Cal.Rptr.3d 475, 489 (Cal. Ct. App. 2012); *Sherwin-Williams Co. v. Johnson*, 989 S.W.2d 710, 715 (Tenn. Ct. App. 1998). Specifically, the two California cases, *Microsoft* and *General Mills*, reviewed whether the disputed transactions—marketable security investments in the case of *Microsoft* and futures contracts in the case of *General Mills*—were "qualitatively different" from the company's main business and if inclusion of the gross receipts resulted in a substantial "quantitative distortion." *Microsoft*, 139 P.3d at 1179; *Gen. Mills*, 146 Cal.Rptr.3d at 484.[6]

---

[6]  *Sherwin-Williams* followed a similar analysis to *Microsoft* and *General Mills* but used different language than the qualitative and quantitative factors. *Sherwin-Williams* 989 S.W.2d at 713, 714 (using terms such as "hyper-inflated sales factor" and "absurdity" in describing the tax apportionment of similar inter-business treasury department techniques from cases in New Jersey and Indiana). Regardless, all three relevant out-of-state jurisdiction cases relied on by the tax court affirmed the use of an alternative apportionment formula, which allowed the Sales Factor to include net income but not gross

9

The tax court analogized the current dispute to *Microsoft* and *General Mills*, applying the qualitative and quantitative assessment used in those cases to DuPont. It determined that the general apportionment method did not fairly reflect DuPont's income allocable to Minnesota because (1) FEC transactions are qualitatively different from DuPont's other business activities, and (2) including gross receipts from FEC transactions quantitatively distorted DuPont's Everything Sales and, therefore, its apportionment factor. *DuPont*, 2024 WL 3152928, at *17, *20.

As to the qualitative assessment, the tax court determined that "[t]he purpose of FEC transactions was to protect DuPont's earnings, and to enable investors to see the true operating performance of DuPont, unaffected by currency fluctuations" and that these FEC transactions "did not serve an independent profit-oriented purpose."[7] *Id.* at *1. This, the tax court determined, was different from DuPont's other business activities since DuPont is a science and technology company—not a financial institution—"whose principal business activities comprise chemical, agricultural, electronic, manufacturing, and consumer products-related sales to many different markets worldwide" and not "the sale of securities or financial instruments" or "transacting in FECs with customers." *Id.* at *17.

receipts from disputed treasury department techniques. That is, all three cases cited followed the same method the tax court employed. The parties did not identify an analogous case that denied the use of an alternative apportionment method under similar circumstances. That said, it also appears no court has directly addressed the issue of FEC transactions in state tax apportionment before.

[7] The tax court noted that FEC transactions "serve an important and even a critical supportive function" to DuPont's business, but they would be "economically meaningless" if "removed from their underlying purpose." *DuPont*, 2024 WL 3152928, at *17 (internal quotation marks omitted).

Regarding the quantitative inquiry, the tax court evaluated the impact that the inclusion of gross receipts from FEC transactions had on DuPont's tax liability in Minnesota. Other jurisdictions have found that when a high volume of gross receipts inflates the Everywhere Sales denominator of the apportionment formula without adding to overall income and shifts the allocability of profits to other states, it creates a substantial distortion. *See Microsoft*, 139 P.3d at 1182 (finding a substantial quantitative distortion when the gross receipts constituted 73 percent of total gross receipts but under 2 percent of net income); *Gen. Mills*, 146 Cal.Rptr.3d at 491 (agreeing that gross receipts from hedging activities created a substantial distortion in apportionment when 8 to 30 percent of all gross receipts came from a hedging technique that netted at most 2 percent of income). The tax court similarly concluded that there was a substantial distortion here since FEC transactions produced between 1.7 and 4.5 percent of income and generated over 70 percent of gross receipts, which "quantitatively distorts total sales, net income, and, ultimately, the apportionment factor by nearly threefold." *DuPont*, 2024 WL 3152928, at *20.

Because the tax court agreed that the Commissioner met his burden to demonstrate that the general apportionment method did not fairly reflect DuPont's income allocable to Minnesota, the final step was evaluating whether the alternative formula—removing gross receipts from FEC transactions from the apportionment factor calculation and substituting net income from FEC transactions—*did* fairly reflect DuPont's activities in the state. The tax court, again, turned to other jurisdictions that all included a similar alternative apportionment method. *See Sherwin-Williams*, 989 S.W.2d at 715–16; *Microsoft*, 139 P.3d at 1182; *Gen. Mills*, 146 Cal.Rptr.3d at 496. The tax court found that the

11

Commissioner met his burden. *DuPont*, 2024 WL 3152928, at \*20–21. The tax court concluded that, by including net income, the alternative formula "maintain[ed] a connection between that income [generated from FEC transactions] and the apportionment factor" without overwhelming the Everywhere Sales denominator. *Id.* at \*20 (internal quotation marks omitted). This approach also ensured that the apportionment of DuPont's income was fair across multiple states, since Delaware (where these transactions occurred and thus are allocated) uses an FEC net income approach.[8] *Id.*

The tax court issued an Order for Judgment on August 12, 2024, ordering DuPont to pay the assessed taxes plus interest. *E. I. duPont de Nemours and Co. & Subsidiaries v. Comm'r of Revenue*, No. 9485-R, 2024 WL 3765118, at \*1 (Minn. T.C. Aug. 12, 2024). DuPont appealed.

**ANALYSIS**

Our review of a tax court's decision "is limited and deferential." *Minn. Energy Res. Corp. v. Comm'r of Revenue (MERC)*, 886 N.W.2d 786, 792 (Minn. 2016). It is limited "to determin[ing] whether the tax court lacked subject matter jurisdiction, whether the tax court's decision is supported by evidence in the record, and whether the tax court made an

---

[8]     DuPont offered an alternative apportionment method that "includes only those FEC gross receipts that relate to the international transactions" reported by those subsidiaries included in its Minnesota's returns, but the tax court did not find this to be a reasonable alternative because most of the transactions occurred in Delaware, and the tax court concluded that DuPont had "not explained how treating some Delaware-sited transactions differently than others would fairly reflect DuPont's net income allocable to Minnesota." *DuPont*, 2024 WL 3152928, at \*21 (internal quotation marks omitted).

12

error of law." *Hohmann v. Comm'r of Revenue*, 781 N.W.2d 156, 157 (Minn. 2010); *see also* Minn. Stat. § 271.10, subd. 1 (2024).

This case involves the application of Minnesota Statutes section 290.20's alternative apportionment method. The statute provides as follows:

> Subdivision 1. **Statutory methods to determine; petition for use of other methods.** The methods prescribed by section 290.191 shall be presumed to determine fairly and correctly the taxpayer's taxable net income allocable to this state. If the methods prescribed by section 290.191 do not fairly reflect all or any part of taxable net income allocable to this state, the taxpayer may petition for or the commissioner may require the determination of net income by the use of another method, if that method fairly reflects net income. These other methods may include:
> (1) separate accounting;
> (2) excluding any one or more of the factors;
> (3) including one or more additional factors; or
> (4) some other method.

Minn. Stat. § 290.20, subd. 1. In *Associated Bank*, we determined that the phrase "do[es] not fairly reflect" in this context means "that the method prescribed under section 290.191 does not show, to a full degree or extent, all or any part of the taxpayer's income arising from taxable business activities in Minnesota." 914 N.W.2d at 405; *see also W. Union Tel. Co. v. Spaeth*, 44 N.W.2d 440, 441 (Minn. 1950) (standing for the principle that the "judicial construction of a statute, so long as it is unreversed, is as much a part thereof as if it had been written into it originally" (citation omitted) (internal quotation marks omitted)); *Curtis v. Altria Group, Inc.*, 813 N.W.2d 891, 900 (Minn. 2012) (same).

The question before us is whether the tax court correctly determined that the Commissioner met his burden to prove that the general apportionment method does not fairly reflect DuPont's taxable income allocable to Minnesota and that the applied

alternative apportionment method—which included net income but not gross receipts from FEC transactions—does so. DuPont argues that the tax court made both factual and legal errors, which, if true, would require reversal or a remand. We address these in turn below. Because we conclude that the tax court did not err, we affirm.

A.

We first address the alleged factual errors raised by DuPont. Factual findings are reviewed for clear error, *MERC*, 886 N.W.2d at 792, meaning they are upheld when "there is sufficient evidence in the record for the tax court to reasonably reach its conclusion." *Associated Bank*, 914 N.W.2d at 400 (citation omitted) (internal quotation marks omitted). "[T]he tax court typically determines the weight and credibility of . . . testimony, including that of the expert witnesses." *Menard, Inc. v. Cnty. of Clay*, 886 N.W.2d 804, 813 (Minn. 2016) (alteration in original) (citation omitted) (internal quotation marks omitted); *see also In re Objection to Real Prop. Taxes*, 353 N.W.2d 525, 534 (Minn. 1984) ("The determination of whether the taxpayer has met this burden of establishing the true market value of property rests with the trial court's resolution of the evidence and the weight and creditability of the testimony, including the opinions of expert witnesses." (citation omitted) (internal quotation marks omitted)). We defer to the tax court's credibility determinations. *Eden Prairie Mall, LLC v. Cnty. of Hennepin*, 830 N.W.2d 16, 21 (Minn. 2013).

The tax court concluded "that FEC transactions and DuPont's other business activities were qualitatively different from each other," that the purpose of FEC transactions is "only a supportive function" and "a risk management tool that directly

14

supports [DuPont's] main line of business," and that "FEC transactions did not serve an independent profit-oriented purpose." *DuPont*, 2024 WL 3152928, at \*17, \*20 (alteration in original) (citation omitted) (internal quotation marks omitted). The tax court relied on these findings to conclude that the Commissioner met his burden of proving that the general apportionment method under section 290.191 did not fairly reflect DuPont's income allocable to the State. *Id.* at \*16. Specifically, the tax court determined that because gross receipts from FEC transactions were included in the apportionment calculation but *not* included among the type of profit-oriented businesses DuPont engaged in, the resulting Sales Factor did not fairly reflect DuPont's business activities. *Id.* at \*20.

DuPont claims that these findings were erroneous for three reasons: (1) gross receipts from FEC transactions are earned in the ordinary course of business and thus are a part of DuPont's business, (2) the tax court mischaracterized the testimony of the expert witnesses, and (3) FEC transactions create profit and thus are a profit center. We disagree.

## 1.

First, DuPont argues that the tax court's determination "that FEC transactions and DuPont's other business activities were qualitatively different from each other," *id.* at \*17, overlooks the parties' stipulation that the gross receipts from FEC transactions were earned in the ordinary course of business. Because DuPont engages in FEC transactions in the ordinary course of business, DuPont asserts that they are inherently a part of its general operating scheme and should be considered part of DuPont's business activities.

While it is true that FEC transactions were conducted in the ordinary course of business, that does not preclude the tax court's finding that FEC transactions are

15

qualitatively different from DuPont's other business activities. DuPont rests heavily on the joint stipulation of facts, yet those same facts work against its argument. The stipulation states that "DuPont is a science and technology company whose businesses manufacture and sell a wide range of products to many different markets, including the nutrition, health care, pharmaceuticals, agriculture, automotives, textiles, home and construction, packaging, electronics, and transportation markets." Nothing in that enumerated list includes FEC transactions, and there is no mention of currency exchange, financial instruments, or hedging techniques. DuPont is not a hedge fund firm or financial institution, and FEC transactions do not naturally fit into the general categories of "science" or "technology." Nothing in the parties' joint stipulation convinces us that FEC transactions must be considered part of DuPont's business activities.

DuPont maintains that the phrase "sell a wide range of products to many different markets" incorporates FEC transactions by reference as part of the company's international operations. We are not persuaded. If anything, the fact that DuPont lists a string of markets and acknowledges that it engages in business in approximately 90 countries supports the premise that FEC transactions serve a primarily supportive position to *allow* DuPont to access international markets, rather than justifying the position that FEC transactions are their own business activity. The record supports the finding that FEC transactions and DuPont's other business activities were qualitatively different from each other, and the tax court did not clearly err in so concluding.

Additionally, DuPont argues that the joint stipulation contains a "non-exhaustive list" that does not identify DuPont's principal business activities such that one could

16

conclude FEC transactions are excluded. That is, by failing to designate lines of business as "principal business activities" in the joint stipulation of facts, it is impossible to say FEC transactions are not included in the category. Again, DuPont is correct that the joint stipulation did not designate activities as "principal," but that is irrelevant. The main consideration is that DuPont, in a stipulation of facts, self-identified its business areas and, in doing so, did not include FEC transactions. Context provides, and the tax court concluded, that FEC transactions are different from the listed business areas. Additionally, because the standard of review for factual findings is clear error, the tax court's decision will be disturbed only if there is not "sufficient evidence in the record for the tax court to reasonably reach its conclusion." *Associated Bank*, 914 N.W.2d at 400 (citation omitted) (internal quotation marks omitted). We find that the record supports the tax court's conclusions that the stipulated list of markets named—nutrition, health care, pharmaceuticals, agriculture, automotives, textiles, home and construction, packaging, electronics, and transportation—are DuPont's business activities and FEC transactions are qualitatively different than those business activities, even though FEC transactions were earned in the ordinary course of business.

This conclusion is bolstered by FECs' operating structure. FECs are a risk management strategy employed by DuPont to protect its already-existing, though not paid, profits. An internal hedging program run by DuPont to mitigate foreign currency risk is categorically different than, for example, the automotive or health care markets. The joint stipulation and DuPont's operating procedure support the tax court's findings of qualitative differences, and the tax court did not commit clear error.

17

2.

DuPont next challenges the tax court's characterization of expert witnesses' testimony regarding the purpose of FEC transactions. The tax court noted that both parties' experts agreed that the purpose of FEC transactions is to reduce foreign currency risk, protect the value of DuPont's earnings, and enable investors to see the true operating performance of DuPont, rather than serve as "a standalone profit center." *DuPont*, 2024 WL 3152928, at *17. DuPont argues that this is a mischaracterization of the evidence because the Commissioner's expert did not evaluate the profitability of DuPont's other lines of business and could not opine on whether FEC transactions were a standalone profit center or whether DuPont regularly included other business operations like FEC transactions in its apportionment factor. Further, DuPont points out that its expert testified that because DuPont is a for-profit company and FEC transactions increase profits, FEC transactions share the same purpose as the rest of the business, and there should be no difference in the apportionment of profits from FEC transactions and other lines of business's profits.

DuPont's arguments are not compelling because the tax court's findings are not inconsistent with the testimony of the expert witnesses. What the tax court found is that FEC transactions serve a "*supportive* risk management function," in which FEC transactions aim "to protect DuPont's earnings, and to enable investors to see the true operating performance of DuPont, unaffected by currency fluctuations." *Id.* at *16–17 (emphasis added). Protecting outstanding earnings is not tied to the creation of incidental

18

profit, DuPont's overall goal to make profit, or the profitability of other sectors. That means DuPont's arguments, even if true, do not demonstrate that the tax court clearly erred.

Further, DuPont's own policies and documents support the idea that FEC transactions are supportive tools, not independent profit centers. For example, DuPont's Corporate Financial Risk Management Policy states that the "business objective" of the foreign currency risk management program (which FECs are a part of) is "to maintain an approximately balanced position in foreign currencies in order to *minimize exchange gains and losses resulting from exchange rate changes*, net of related tax effects." (Emphasis added.) Additionally, DuPont's Corporate Financial Risk Management Guidelines states that derivatives, which include FECs, are explicitly not "used for speculative purposes" and are not "authorized for use with intention to *profit* from expected changes in the fair value of the [FEC]." (Emphasis added.) Not only was the tax court within its discretion to find the expert witness' testimony credible regarding the purpose of FEC transactions, but documents in the record also provide sufficient evidence to affirm that the tax court did not clearly err.

3.

Third, DuPont argues that the tax court's determination that FEC transactions "did not serve an independent profit-oriented purpose," *id.* at *1, *20, is not supported by the record because FEC transactions did, in fact, earn profit. FEC transactions produced somewhere between 0.48 percent to 4.49 percent of DuPont's total net income for the years in dispute and, as DuPont emphasized, in 2014 and 2015, the net income from FEC transactions was higher than three of DuPont's business segments (Electronics &

19

Communications, Industrial Biosciences, and Nutrition & Health). While these facts show that FEC transactions can result in profit, profitability does not indicate *purpose*. It is undisputed that FEC transactions can create net income depending on the spot rate (this is why the alternative apportionment formula includes net income in the Everywhere Sales). What DuPont is trying to dispute is the tax court's finding that the purpose of FEC transactions as a hedging technique is qualitatively different than DuPont's other lines of business as a science and technology company. Nothing in the record, including incidental profit, disturbs the tax court's findings here. Thus, its determination that FEC transactions serve a different purpose from DuPont's other business activities was not clearly erroneous.

The tax court determined that FEC transactions served a qualitatively different function than the rest of DuPont's lines of business, and their inclusion in the general apportionment formula created a quantitative distortion of DuPont's business activities within the state. There is ample evidence in the record to support these findings, and we therefore conclude that the tax court did not clearly err in its factual findings.

B.

We next turn our attention to DuPont's arguments that the tax court erred as matter of law by finding that the Commissioner met his burden to demonstrate that the general apportionment formula did not fairly reflect DuPont's business activities in Minnesota, and that an alternative formula including net income but excluding gross receipts from FEC transactions did. We review legal conclusions by the tax court de novo. *Associated Bank*, 914 N.W.2d at 400.

20

Under section 290.191's general apportionment formula, DuPont may include *all* gross receipts, including gross receipts from FEC transactions, in calculating its Sales Factor. Minn. Stat. § 290.191, subd. 5. The tax court found that the Commissioner met his burden to demonstrate that the inclusion of gross receipts from FEC transactions did not fairly reflect DuPont's business activities in Minnesota because FEC transactions served a qualitatively different purpose than DuPont's business activities. *DuPont*, 2024 WL 3152928, at *16-17. And the tax court further agreed with the Commissioner that including the extraordinary volume of gross receipts from FEC transactions in the Everywhere Sales denominator would produce a quantitative distortion. *Id.* at *20. That is, the inclusion of gross receipts from FEC transactions was inappropriate because FEC transactions are meant to manage risks associated with business activities rather than independently *be* a business activity. Further, the routine practice of exchanging foreign currencies used by DuPont produced over 70 percent of all gross receipts while netting less than 5 percent of profits. The result of including gross receipts from FEC transactions in the sales factor was an inflated Everywhere Sales denominator and, inversely, a diluted tax liability. *See id.* at *9 ("Any increase in the denominator of the sales factor ('everywhere sales') decreases the percentage of the taxpayer's business income that is taxable in the state. That is, it reduces the taxpayer's state franchise taxes."). Stated otherwise, including gross receipts from FEC transactions did not "show, to a full degree or extent, all or any part of the taxpayer's income arising from taxable business activities in Minnesota." *Associated Bank*, 914 N.W.2d at 405.

21

The tax court also determined that the Commissioner met his burden to demonstrate that his alternative apportionment formula under section 290.20—including net income but not gross receipts from FEC transactions—fairly reflected DuPont's business activities in Minnesota because it proportionally accounted for the profit and business generated by FEC transactions. *DuPont*, 2024 WL 3152928, at *20.

DuPont argues the tax court legally erred in three respects: (1) that the tax court impermissibly created "two categories of income" in separating FEC transactions from other business activities, (2) that the Commissioner failed to analyze whether the Sales Factor was "allocable to Minnesota" as required by statute, and (3) that the Commissioner improperly disputes the results of section 290.191's apportionment formula, rather than the methods used to reach those results. As explained below, we are not persuaded.

1.

First, DuPont argues that treating gross receipts from FEC transactions differently than the gross receipts earned from DuPont's other business activities contradicts Minnesota Statutes section 290.191. Under the general apportionment formula found in section 290.191, the Sales Factor includes "*all* sales, gross earnings, or receipts received in the ordinary course of the business." Minn. Stat. § 290.191, subd. 5(a) (emphasis added). The parties stipulated that gross receipts from FEC transactions are earned in the ordinary course of business and therefore, under the plain language of section 290.191, DuPont argues that gross receipts from FEC transactions should be included in calculating Everywhere Sales. DuPont claims that the tax court "subverted the plain language of the

law . . . by distinguishing between categories of ordinary income" and removing gross receipts from FEC transactions from the general apportionment formula.

DuPont focuses on the wrong statute. Both parties agree that, under the general apportionment formula in section 290.191, gross receipts from FEC transactions are included in calculating the Sales Factor. The dispute here concerns the application of an alternative apportionment formula under section 290.20. Stated differently, the tax court did not remove receipts from FEC transactions from the *general* apportionment formula but applied an *alternative* apportionment formula under section 290.20 that excluded gross receipts from FEC transactions and included net income from FEC transactions. Therefore, section 290.20—not section 290.191—provides the relevant language to interpret.

Section 290.20 empowers the Commissioner to use an alternative apportionment method when the general apportionment formula does not fairly reflect the taxpayer's allocable income to the State. The clear language of section 290.20 allows this alternative apportionment formula to be created by "(1) separate accounting; (2) excluding any one or more of the factors; (3) including one or more additional factors; or (4) some other method." Minn. Stat. § 290.20, subd. 1.

The Commissioner's alternative apportionment approach uses net income from FEC transactions, rather than gross receipts from FEC transactions, which is a modification explicitly allowed under section 290.20. In finding this alternative apportionment method applicable, the tax court did not rewrite the general apportionment method to create "separate categories of ordinary income," "usurp[] the role of the legislature," or "add elements to clarify an ambiguity" in interpreting section 290.191. That is because the tax

23

court *did not interpret section 290.191.* It simply acted under its authority under section 290.20 to allow the Commissioner to use an alternative apportionment method because it found he met his statutory burden. *See Associated Bank*, 914 N.W.2d at 396, 400–02 (allowing the Commissioner to apply an alternative apportionment formula under section 290.20 even when the taxpayer correctly calculated its apportionment under section 290.191 because the Commissioner met her burden under section 290.20). There was no error by the tax court in its application of the plain language of section 290.20, and DuPont's emphasis on section 290.191 is misplaced.[9]

2.

Second, DuPont argues that because the Commissioner failed to analyze DuPont's Minnesota Sales, he cannot make conclusions about whether the general or alternative

---

[9] DuPont argues that because section 290.191 unambiguously includes gross receipts from FEC transactions in calculating the Sales Factor, the tax court's reliance on case law from other jurisdictions was improper. Because this case involves section 290.20 (*not* 290.191) and is an issue of first impression, the tax court did not err by looking to other jurisdictions for guidance. *See State ex rel. Swanson v. 3M Co.*, 845 N.W.2d 808, 814 (Minn. 2014) (citing *Gordon v. Microsoft Corp.*, 645 N.W.2d 393, 402 n.9 (Minn. 2002)) ("When our jurisprudence is undeveloped in an area, as it is here, we often consider case law from other jurisdictions for guidance.").

Additionally, to the extent that DuPont argues that the California cases the tax court relied on—*Microsoft* and *General Mills*—were distinguishable, we disagree. In each case, the company employed an economic technique found to be qualitatively different from the main sectors of the business and resulted in a high volume of gross receipts but low net income which, when apportioned, failed to fairly reflect the net income allocable to the State. *Microsoft*, 139 P.3d at 1171,1178–79; *Gen. Mills*, 146 Cal.Rptr.3d at 478–79. The result of this incongruity was the application of an alternative formula where net income or net receipts were included and gross receipts excluded; just as the tax court applied here. *Microsoft*, 139 P.3d at 1182–83; *Gen. Mills*, 146 Cal.Rptr.3d at 495–96. In essence, these cases dealt with similar tax problems and came to similar conclusions. It was proper for the tax court to reference them.

24

apportionment formula "fairly reflect[s]" the income allocable to Minnesota, and it was legal error for the tax court to find he met that burden.

The burden under section 290.20 is "[i]f the methods prescribed by section 290.191 *do not fairly reflect all or any part of taxable net income allocable to this state*, the taxpayer may petition for or the commissioner may require the determination of net income by the use of another method, if that method fairly reflects net income." Minn. Stat. § 290.20, subd. 1 (emphasis added). We have interpreted this to mean the requesting party must prove by substantial—meaning credible—evidence "that the method prescribed under section 290.191 does not show, to a full degree or extent, all or any part of the taxpayer's income arising from taxable business activities in Minnesota." *Associated Bank*, 914 N.W.2d at 403, 405.

DuPont argues that the Commissioner did not meet his burden—to prove either that the general apportionment method under section 290.191 did not produce a fair reflection of income allocable to Minnesota or that his alternative apportionment method did produce such a reflection—because he did not independently analyze DuPont's business activities within the State, and, therefore, he had no reference point from which to argue that the Sales Factor was an unfair representation of DuPont's Minnesota connections. We are not persuaded. Apportionment involves fairly allocating taxable income among the states in which a multistate or multinational company operates. It is governed by a formula, which generates a percentage. That percentage is then applied to a company's net income and the result is *the income allocable to the State*. Any fluctuations or distortions within either the numerator (Minnesota Sales) or denominator (Everywhere Sales) will influence the Sales

Factor, which determines the income allocable to the State. The plain language of section 290.20 does not always compel an articulated analysis of the Minnesota Sales activity; the burden can be met by proving a distortion in either the numerator or denominator.

The tax court did not err in its determination that the Commissioner proved such a distortion. The Commissioner alleged—and demonstrated—that DuPont's gross receipts from FEC transactions were qualitatively different from other business income and including those receipts would result in quantitative distortion. Because he demonstrated that there was a distortion in the Everywhere Sales denominator, the Sales Factor percentage was affected, and the resulting income allocable to the State was not a fair reflection of DuPont's business activities within Minnesota. The Commissioner argued, and the tax court agreed, that inclusion of net income from FEC transactions rather than gross receipts from FEC transactions fairly reflects DuPont's income allocable to Minnesota because it corrected the distortion while retaining a nexus to the income created by FEC transactions. The tax court correctly decided that this alternative apportionment method satisfied the Commissioner's burden under section 290.20.

DuPont also argues that *Associated Bank* requires an evaluation of the Minnesota Sales numerator to meet section 290.20's burden. In *Associated Bank*, we approved the Commissioner's use of an alternative apportionment formula because a bank's corporate structure removed over $140 million in taxable interest income across two years (and thus approximately $5 million in additional taxes) from the general apportionment statute by transferring it to out-of-state LLCs. 914 N.W.2d at 397, 399, 406–07. The issue was that the general apportionment formula was not fairly reflecting the bank's Minnesota Sales

26

numerator because of a corporate structure loophole. *Id.* at 399. Part of the substantial evidence the Commissioner produced in that case to meet her burden under section 290.20 was an audit of the bank that found that applying the general apportionment formula to the LLCs failed to account for the bank's business activities. *Id.* at 399. We determined that the Commissioner met her burden of proof under the specific circumstances argued; we did not, as DuPont suggests, hold that an analysis of Minnesota activities is required to meet the substantial evidence burden in every case in which the Commissioner applies (or a taxpayer requests) an alternative apportionment method under section 290.20.

Determining whether an alternative apportionment formula under section 290.20 is appropriate is done case by case. We have never adopted a bright-line test for what constitutes substantial evidence that shows a fair reflection of allocable income. We disagree with DuPont's arguments that this case-by-case analysis must always include an evaluation of the Minnesota Sales numerator to prove what is or is not a fair reflection of income allocable to the State. Accordingly, the tax court did not commit legal error in concluding that the Commissioner met his burden to show that the general apportionment formula under section 290.191 did not fairly reflect DuPont's business activities in Minnesota and that the alternative apportionment formula, including net income instead of gross receipts from FEC transactions, as allowed under section 290.20, did fairly reflect DuPont's business activities.

3.

Finally, DuPont asserts that the Commissioner failed to meet his burden to prove that the general apportionment method did not "fairly reflect" DuPont's net income

27

allocable to Minnesota because he is disputing the results (Sales Factor) and not the calculations or methods of the general apportionment formula. *See HMN Fin., Inc.*, 782 N.W.2d at 567 (stating that the moving party must meet the burdens under section 290.20 and cannot merely "take issue with the result rather than the methods [the taxpayer] used to reach that result"). DuPont contends that the Commissioner impermissibly argues that the final apportionment percentage is too low, not that the general apportionment method failed to fairly reflect DuPont's income allocable to Minnesota.

DuPont's argument does not fairly characterize the Commissioner's position. This case is about the application of the general apportionment method to DuPont *which resulted in* a distorted Sales Factor percentage that does not "fairly reflect" DuPont's allocable income to Minnesota. The resulting Sales Factor percentage is not the basis of the claimed distortion. Instead, the arguments revolve around the quantitative and qualitative factors that indicate why including gross receipts from FEC transactions does not fairly reflect DuPont's business activities.

Alluding to our decision in *HMN Financial*, DuPont asserts the Commissioner must challenge the method used, "not merely the results of the applied method." *Associated Bank*, 914 N.W.2d at 402 (citing *HMN Fin.*, 782 N.W.2d at 567). This language is taken out of context. In *HMN Financial*, the Commissioner claimed he had a broad grant of authority to "close statutory tax loopholes" based on four tax provisions, one of which was section 290.20. *Id.* Importantly, the Commissioner did not attempt to meet his burden to

rebut the presumption that the general apportionment formula in section 290.191 produced fair and correct results. *Id.*

Under those circumstances, we determined that section 290.20's alternative apportionment formula was inapplicable because the Commissioner was not disputing the methods used in the general apportionment formula but only the results of those calculations. *Id.* Here, the Commissioner asserts that the general apportionment method includes gross receipts from FEC transactions, and that those gross receipts are distortive and do not "fairly reflect" the income allocable to Minnesota. Thus, the Commissioner properly challenged the apportionment methods used to reach the disputed result, and not merely the results alone.

\* \* \*

The question presented to us is whether the tax court committed legal or factual error in determining that the Commissioner met his statutory burden in demonstrating that the general apportionment method under section 290.191 did not fairly represent DuPont's business activities in the State and that under section 290.20, the Commissioner's alternative apportionment formula—which included net income but not gross receipts from FEC transactions—did. We conclude that the tax court did not err, and we therefore affirm.

## CONCLUSION

For the foregoing reasons, we affirm.

Affirmed.


Thissen, J., took no part in the consideration or decision of this case.

29